RAYMOND DAYAN *et al.*, Plaintiffs-Appellants, *v.* McDONALD'S CORPORATION, Defendant-Appellee.

First District (1st Division)   No. 82—2411

Opinion filed April 16, 1984.—Rehearing denied July 31, 1984.

---

[3]It should be noted that no question was raised on appeal as to the propriety of the punitive damages awarded.

Epton, Mullin, Segal & Druth, Ltd., of Chicago (Saul A. Epton and Gerald B. Mullin, of counsel), for appellants.

Foran, Wiss & Schultz, of Chicago (Thomas A. Foran, Richard G. Schultz, and James R. Figliulo, of counsel), for appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

This appeal arises out of a suit brought to enjoin McDonald's Corporation from terminating plaintiff Raymond Dayan's restaurant franchise in Paris, France. Other issues relating to this controversy have been considered twice before by this court. (*Dayan v. McDonald's Corp.* (1979), 78 Ill. App. 3d 194, 397 N.E.2d 101; *Dayan v. McDonald's Corp.* (1978), 64 Ill. App. 3d 984, 382 N.E.2d 55.)[1] After a 65-day trial, the circuit court of Cook County denied plaintiff's request for a permanent injunction and dissolved an existing preliminary injunction, holding the Paris operations breached the franchise agreement by failing to adhere to McDonald's quality, service, and cleanliness standards (QSC). The trial court issued a 114-page memo-

---

[1]After the filing of these two opinions, Dayan amended his complaint and sued not only individually but also as a representative of Raybill Associates, a limited partnership of which Dayan is the sole general partner, and as a representative of Paris Mac, a foreign corporation and sublicensee of Raybill. For the sake of continuity and simplicity, we will continue to refer to plaintiffs either with the singular "plaintiff" or as "Dayan."

randum opinion setting forth its findings of fact and conclusions of law and a three-page judgment order terminating plaintiff's franchise to operate McDonald's restaurants in and around Paris. Under the order, plaintiff Dayan retains all of his restaurants and is allowed to compete with McDonald's. However, he is prohibited from using McDonald's trademarks or representing the Paris restaurants as being, in any way, affiliated with the McDonald's system. On appeal Dayan raises the following issues for review: (1) whether the trial court erred in making certain evidentiary rulings; (2) whether the trial court applied an erroneous legal standard in determining whether McDonald's acted in good faith in terminating Dayan's franchise; and (3) whether certain findings of fact were against the manifest weight of the evidence.[2]

This case has a lengthy legal and historical background involving prior litigation. Dayan originally filed an action against McDonald's in 1970 alleging the defendant corporation had breached a prior agreement giving Dayan the right to purchase certain franchises and to develop and operate certain restaurants in Paris. In 1971, pursuant to a consent decree, the parties entered into a master license agreement (MLA) over which the courts of France and Illinois were to have concurrent jurisdiction over all controversies. In 1978, McDonald's filed two separate actions against plaintiff Dayan in the High Court of Paris alleging breach of the franchise agreement and infringement of the McDonald's trademark. Dayan responded by initiating the present suit to enjoin McDonald's from terminating the MLA. Additional background material chronicling the litigious relationship between McDonald's and Dayan has been set forth in our previously cited opinions disposing of two interlocutory appeals and will not be repeated here.

I. FACTS

The central issues in this case are factual, involving the propriety of the trial court's findings on Dayan's noncompliance with McDonald's QSC standards and the related finding of McDonald's good-faith termination of the franchise agreement. To the extent necessary, specific trial court findings and the evidentiary basis for those findings have been summarized.

---

[2]The separate appeals from two additional trial court orders awarding McDonald's attorney fees, expenses and costs incurred in defending this lawsuit have been consolidated and reviewed in a separate opinion. *Dayan v. McDonald's Corp.* (1984), 126 Ill. App. 3d 11.

The unique character of the 1971 license agreement was a key factor at trial. The record reveals that the terms of this agreement were the subject of extensive negotiations between McDonald's and Dayan and differed substantially from McDonald's standard licensing agreement. These differences formed the basis for many of the trial court's pivotal evidentiary rulings and findings of fact.

Steven Barnes, the chairman of McDonald's international division, and Donald Lubin, McDonald's outside counsel, negotiated the subject licensing agreement with Dayan and his attorney partner. Lubin testified that Dayan had initially declared a preference for a license agreement similar to the one given for the development of the Canadian market. In October 1970, McDonald's submitted three alternate proposals to Dayan. Proposal 1 was McDonald's standard license agreement with a 3% royalty fee on gross receipts, real estate to be bought and developed by McDonald's with rental rates comparable to U.S.A. leases. Proposal 2 was a joint venture with McDonald's and Dayan each owning 50% equity. Proposal 3 was a developmental license similar to the original Canadian franchises and provided for a 1% royalty fee, Dayan to develop his own real estate, and no McDonald's service except as ordered and paid for by Dayan.

Under the standard McDonald's license embodied in proposal 1, McDonald's would be obligated to provide extensive services to Dayan in all areas of restaurant operations and Dayan would pay a correspondingly higher royalty fee. McDonald's personnel gave testimony on the elaborate nature of the service program under the standard 3% McDonald's contract. It consists of a minimum of one annual full-field inspection by a specially trained McDonald's consultant. The inspection process takes two to three days to complete and is viewed by McDonald's as both a training opportunity for the operator and a process to ensure that minimum QSC standards are being met by their franchisees. During the inspection, the consultant reviews all aspects of the restaurant's operation, completes a standardized full-field inspection form, and reviews the form "point by point" with the operator. The consultant returns in 30 to 90 days for an unannounced follow-up visit and assigns a letter grade in each of the three categories of quality, service and cleanliness and a permanent overall grade to the restaurant. Additional "work visits" are made during the year by the consultant, the field service manager, and the regional manager. In addition to these services, McDonald's provides the operator with extensive assistance in the areas of advertising, purchasing, production, bookkeeping, and personnel.

McDonald's personnel testified further on the assistance given

substandard operators under the 3% license agreement. When a consultant finds that an operator is not meeting QSC standards, he will set up a program to work with the operator to correct any deficiencies. Within six months after the first full-field inspection and follow-up visit, the inspection process will be repeated. The consultant will also immediately begin working with the operator by making frequent visits to the restaurant and offering assistance and advice. If the field consultant is still unsuccessful in assisting the operator in curing QSC deficiencies, the regional manager will work with the operator to correct the problem. After McDonald's has provided the above services, and the regional director determines that the operator is unable or unwilling to meet minimum standards, McDonald's will suggest that the operator sell to a qualified buyer. If the franchisee refuses to sell, the matter is then referred to McDonald's legal department, which will not begin default proceedings unless it determines field service gave "maximum effort" and "has given the operator every assistance toward upgrading his operation."

Both Barnes and Lubin testified that they urged Dayan to accept the standard license agreement, but Dayan insisted upon the 1% developmental license. Barnes testified that he told Dayan the 1% license was a mistake and that Dayan would have to spend more than the 2% difference to properly develop the market without McDonald's operational assistance. Lubin testified that he attempted to persuade Dayan to accept the 3% service agreement, stating that the Caribbean franchisees who had similar 1% developmental licenses were having difficulty in complying with QSC standards because they were not requesting that McDonald's provide service under the agreement. Dayan prevailed in his demand for the 1% royalty fee with the limited service provision and the MLA was executed on May 5, 1971.

While McDonald's had initially proposed a 1% royalty for a 20-year franchise, Dayan negotiated a 30-year franchise in consideration for periodic ½% increases in 1981 and 1986 to a maximum of 2½% beginning July 1, 1991. The service provision provides:

> "Article 8.3. McDonald's further agrees that, at the written request of Dayan, it will make available to Dayan in the Territory [France] such of its personnel assigned overseas responsibilities as may be reasonably available for consultation with Dayan or his employees, for reasonable periods of time, to help give effect to this Agreement. However, the parties acknowledge that McDonald's personnel are limited and that McDonald's may not be able to fulfill all of Dayan's requests for consultation."

Article 8.4 provides that Dayan will bear the cost of any service provided.

The necessity of maintaining the QSC standards is explicitly recognized in the MLA. In Article 7.3 of the agreement Dayan acknowledged his familiarity "with the 'McDonald's system,' with McDonald's standards of 'Quality, Service, and Cleanliness,' with the need for the maintenance of McDonald's quality standards and controls ***." The same article also recites the rationale for maintaining QSC standards—"departure of Restaurants anywhere in the world from these standards impedes the successful operation of Restaurants *** throughout the world, and injures the value of its [McDonald's] Patents, Trademarks, Tradename, and Property ***." Under Article 7.3 Dayan agreed to "maintain these standards as they presently existed" and to observe subsequent improvements McDonald's may initiate. Article 7.1 further provides that Dayan will not vary from QSC standards without prior written approval.

The MLA also contains specific default provisions. Article 23.1(a) gives McDonald's the right to terminate if "Dayan shall default in the performance of any term of this agreement and shall fail to remedy such default within sixty (60) days after written notice ***." Article 13.2 provides "Dayan personally, fully, and unconditionally guarantees the prompt and full performance *** of all obligations to McDonald's."

In addition, the MLA required McDonald's to issue Dayan operating licenses for each restaurant opened. Pursuant to the MLA, McDonald's issued 14 operating license agreements (OLA) to Dayan which also unequivocally obligated him to maintain McDonald's standards in the operation of each restaurant. Paragraph 8(A) of each OLA required Dayan to keep each establishment "in good condition and repair and in a clean and neat appearance, in compliance with the standards fixed *** in the Operating Manual ***." Paragraph 8(C) also provides that all employees will wear uniforms and render courteous service, that only approved paper goods and packaging be used, and that "only such flavoring and garnishments and ingredients as shall comply with the specifications, selection, variety, proportion, appearance, quality, flavoring, and other ingredients or characteristics for such designated food products as are set forth in the Operations Manual" shall be used in the restaurants. The OLAs also included the following termination provision:

> "(G) Licensee acknowledges that uniform quality and taste of food, excellence of service, cleanliness, appearance and general performance are of the utmost importance to the successful op-

eration of the business venture of the Licensee and of all other Licensees using said System, and in order to assure adherence to the above standards and all other provisions in this License Agreement relating to the general operation (as more fully set forth in this paragraph 8) the Licensee agrees that any violation of this paragraph 8 shall be deemed to be a substantial breach of this Agreement and shall give the Licensor the right to terminate this Agreement in accordance with the terms of paragraph 16 herein."

In the trial court's memorandum opinion the MLA was characterized as "a unique and stylized franchise for Dayan" and "the result of protracted negotiations." The trial court contrasted McDonald's service obligations under the standard license agreement and the developmental license agreement, finding "a developmental licensee who pays a 1% royalty *** neither pays for nor receives these inspectional, education, and consultation services from [McDonald's]." The trial court further noted:

"Since QSC is the standard to measure a restaurant's operations whether or not the service fee is being paid, the 3% fee appears from this record only to impact McDonald's conduct in nursing a substandard operator back to compliance. The testimony is clear, if the licensee pays the 3% service fee the total resources of the parent company will be marshalled to help the operator. If however the licensee does not pay the 3% royalty then the company feels justified (as in the case of the Caribbean license as well as Dayan's) in standing aside and watching the operator struggle."

Pursuant to the provisions of the MLA, Dayan and McDonald's set about the business of developing the Paris market. The trial court found that prior to February 1977 McDonald's exercised good faith in attempting to obtain compliance with QSC standards. Far from "standing aside and watching the operator struggle," the trial court found that during these early years McDonald's "encouraged him [Dayan], assisted him, financed him, accommodated him, nurtured him, cajoled him, pleaded with him and supported him."

Barnes, the president of McDonald's international division, testified at length about the Dayan-McDonald's relationship during these early years (1970-1977). Barnes traveled to Paris frequently and helped Dayan plan his development program, he looked for real estate sites with Dayan, he visited suppliers with Dayan, he sought out suppliers in Europe and advised Dayan "to use our suppliers in Holland and Germany," he arranged for numerous advisors to parade in and

out of Paris over the years in an effort to assist or advise Dayan, he negotiated price reductions with suppliers for Dayan, and he secured Dayan financing by McDonald's beyond the MLA limits. There was never a written request for any of this help, nor was Dayan ever charged by McDonald's for this assistance. Barnes also testified that in June 1974 he "was upset and disappointed" that two years after the opening of the first restaurant in Paris "the only likeness that I could see to McDonald's was the sign" on Dayan's stores. Barnes stated that Dayan's stores were filthy, and he personally reminded Dayan of his responsibility to maintain McDonald's QSC standards. In October 1975 Barnes told Dayan he was "discouraged and completely destroyed" by three years of Dayan's lip-service with "no intention of improving" the condition of his stores. Barnes also testified that he was "ashamed and embarrassed" at what other European franchisees and personnel had seen and experienced in one of Dayan's restaurants during a purchasing meeting in Paris.

Other witnesses called by McDonald's corroborated Barnes' testimony as to the deplorable condition of Dayan's restaurants. In particular, their testimony revealed that Dayan was not using approved products, he refused to delay the opening of his first restaurant even though McDonald's personnel had declared it unfinished and unsuitable for opening, he used no pickles, he charged extra for catsup or mustard, he hid straws and napkins under the counter, he responded to complaints from McDonald's personnel with "If they don't like it, they can buy me out," he refused to take a refresher course at McDonald's "Hamburger University," the stores were filthy and without many items of necessary equipment, the store crews were poorly trained and frequently out of uniform, and customer complaints were numerous.

Dayan's own testimony corroborates the fact that over the years McDonald's made demands for changes in his operating procedures. Dayan testified that McDonald's had made these demands with respect to the training of personnel and concerning the maintenance of equipment and had warned him about using raw food products not in accord with McDonald's specifications.

The trial court found the testimony of Barnes and the other McDonald's witnesses to be highly credible and noted that Dayan himself confirmed many of Barnes' recollections. The trial court stated "he [Dayan] admitted receiving the assistance and meeting a wide variety of McDonald's staff sent by Barnes over the years—where Barnes or others testified that they had rebuked him for his operational deficiencies Dayan generally did not remember."

Barnes further testified that in June 1976 he told Dayan that his substandard operation could no longer be tolerated. Barnes informed Dayan that he would be given six months to bring his restaurants up to standard and at the end of this period McDonald's would exercise its right to formal inspection. These inspections were performed eight months later in February 1977 by Sollars and Allin, two McDonald's employees. The trial court characterized these inspections as signaling the "end of five years of indulgence, forbearance, and carte blanche tolerance of Dayan's excuses."

Allin and Sollars visited all of the Paris McDonald's stores, doing a full-field inspection at four and a partial full-field at a fifth. They found gross violations of McDonald's QSC standards at all the stores they visited. Sollars testified that he "told Raymond that if the worst store I had ever seen in the United States was an A then his had to be Z," to which Allin added, "these are absolutely the worst stores I have ever seen in my life." Both Sollars and Allin testified that over an eight-day period they counseled store managers at each location, noting deficiencies and the methods needed to overcome them; they prepared cleaning and maintenance checklists for store managers; they demonstrated approved techniques to store crews and managers; they prepared an outline of their observations for Dayan and discussed remedial procedures with him for nearly eight hours. Allin and Sollars returned to Paris for follow-up inspections in June and July of 1977. Conditions in the restaurants generally had not changed—QSC standards were not being met, products were not properly prepared and some stores were even dirtier.

The record reveals that after being advised of the continuing substandard conditions of the Paris restaurants, McDonald's considered sending a formal notice of default. Instead, in July 1977, a stern warning letter was sent to Dayan advising him that the number, variety and severity of QSC deficiencies justified a default declaration but that such declaration would be held in abeyance for six months to "give you an opportunity to take immediate corrective action." Ultimately, McDonald's brought suit in Paris to terminate the MLA, which resulted in Dayan filing the present suit in Illinois to enjoin termination.

II. EVIDENTIARY RULINGS

A. OTHER-SITE EVIDENCE

In an attempt to prove McDonald's engaged in a custom and practice of accepting substandard operators, Dayan offered into evidence

documents recording the condition of other McDonald's restaurants. These documents consisted of McDonald's full-field reports, follow-up reports and letters to the operators which were obtained through discovery. He also offered the testimony and reports of students who were hired by Dayan's attorneys to visit restaurants in selected locations, and he offered certain city health inspection reports. Of the more than 6,900 McDonald's restaurants worldwide, Dayan tendered to the court evidence of conditions that existed in only 159 restaurants which operated under McDonald's standard license agreement (3% royalty). The contents of this offer of proof represents what remained after plaintiff had eliminated nearly all of the 30,000 to 40,000 field reports produced at his request and after eliminating most of the findings of his own investigators.

This offer of proof was rejected by the trial court on relevancy grounds. The court reasoned that Dayan's MLA imposed contractual duties and obligations different from those in the standard license agreement and therefore evidence of contractual performance and QSC compliance of these franchises was neither relevant nor material. Dayan contends that the trial court erred in rejecting his offer of proof. We disagree.

Evidence is considered relevant if it has a tendency to prove a fact in controversy or render a matter in issue more or less probable. (*Marut v. Costello* (1966), 34 Ill. 2d 125, 127, 214 N.E.2d 768; *Mueller v. Yellow Cab Co.* (1982), 110 Ill. App. 3d 504, 508, 442 N.E.2d 595.) Whether the proffered evidence has such a tendency must be tested in light of logic, experience, and accepted assumptions as to human behavior. (*Marut v. Costello* (1966), 34 Ill. 2d 125, 128, 214 N.E.2d 768.) Each party is entitled to present evidence which is relevant to his theory of the case as well as evidence which tends to show conduct inconsistent with an opponent's theory. *Vendo Co. v. Stoner* (1982), 108 Ill. App. 3d 51, 54-55, 438 N.E.2d 933.

Here, plaintiff advances essentially two theories of relevance for the other-site evidence. First, he contends that the proffered documents would have established a custom and practice understood by the parties as to what the QSC standards mentioned in section 7.3 of the MLA mean. Second, he contends that the other-site evidence would have established a custom and practice with respect to the default and termination procedures of the MLA which the parties understood and which McDonald's violated. These two lines of argument, though related, are theoretically distinct. The first line of inquiry is directed toward defining the QSC standards, while the second line of inquiry is directed toward defining enforcement procedures given non-

compliance with QSC standards.

With respect to Dayan's first argument, McDonald's contends that there is no real dispute on the issue of what the QSC standards are. At trial, McDonald's introduced into evidence its operation and training manual and its equipment and maintenance manual, asserting that these manuals and their periodic updates completely set forth all of McDonald's QSC standards. On cross-examination, Dayan testified that he received these manuals and that they "contain" and "set forth the standards of quality, service and cleanliness." He also agreed that a licensee must totally adhere to the standards outlined in McDonald's manuals and updates, that the MLA explicitly provides for maintaining QSC standards, and that quality, service, and cleanliness are paramount and must be maintained at all costs.

■ It is well settled in Illinois that a party can, by his own testimony, make a judicial admission which conclusively precludes assertion of a contrary position. (*Tolbird v. Howard* (1969), 43 Ill. 2d 357, 362, 253 N.E.2d 444; *Kosin v. Shero* (1977), 45 Ill. App. 3d 1047, 1051, 360 N.E.2d 572.) We believe that Dayan's deliberate and unequivocal testimony removed from contention the issue of what McDonald's QSC standards are. Accordingly, the other-site evidence offered to show QSC standards different from those given in McDonald's manuals was properly rejected by the trial court.

In addition, we note that the proffered documents clearly showed that the same operational QSC standards were being applied throughout the McDonald's system. In every report plaintiff tendered to the court, the restaurant in question was given failing grades by the McDonald's inspector in one or more of the three categories of quality, service, or cleanliness. Far from showing acquiescence in noncompliance, these reports tend to show just the opposite—failure to maintain QSC standards was unacceptable to McDonald's. The issue then remains whether the other-site evidence should have been admitted to show a custom and practice with respect to enforcement procedures. This leads to plaintiff's second theory of relevance.

■ Dayan argues that the other-site evidence was relevant for purposes of demonstrating a uniform custom and practice of assisting an operator that does not meet QSC standards and of tolerating rather than terminating nonconforming franchisees. This argument would be more persuasive if Dayan had adopted a litigation posture consistent with this theory at trial. Nearly all the evidence in Dayan's case in chief and case in rebuttal was directed toward proving total adherence to all of McDonald's QSC standards and that the defendant corporation's evidence to the contrary was fabricated in an effort to

recapture the Paris market. Since Dayan consistently argued a position of complete QSC compliance, the relevance of a custom and practice with respect to assistance given to noncomplying operators is already questionable. However, assuming this hurdle can be overcome, we find the trial court properly rejected Dayan's offer of proof based on the differences between the Dayan master licensing agreement and the licensing agreements of the other restaurants.

We have previously examined in detail the standard license agreement which the licensees subject to the offer of proof operated under and the materially different contract Dayan negotiated after rejecting the standard license agreement. The trial court ruled that the offered evidence was not probative of Dayan's contention that McDonald's did not enforce standards and tolerated widespread QSC noncompliance. It found that in consideration for the 3% royalty fee paid by each licensee given in Dayan's offer of proof, McDonald's was obligated to "nurse a substandard operator back to compliance" by marshaling its resources to help the operator. It held that McDonald's failure to terminate the license of an operator subject to the offer of proof was not relevant because McDonald's had a "duty" to work with the substandard operators under their contracts to correct violations before it could default, while Dayan negotiated a "clearly different" contract which did not obligate McDonald's to provide such predefault service.

These findings are well supported by the record. The undisputed testimony of McDonald's personnel revealed the existence of a uniform custom and practice of assisting its licensees under the standard license agreement in maintaining QSC compliance through an extensive system of inspections and instruction. Dayan rejected this agreement, opting for a lower royalty fee, 1%, and a service provision wherein McDonald's would offer on-site assistance only at Dayan's request and expense. To argue that the same predefault assistance was applicable to plaintiff absent a specific written request and a willingness to bear the cost of such assistance is clearly without merit.

We find that the distinct service obligations assumed by McDonald's under the standard license agreement engendered a distinct QSC enforcement and termination procedure wherein McDonald's was required to offer considerable assistance to a noncomplying operator before terminating the franchise agreement. Evidence of QSC violations in a small number of cases where the franchisee was working under a standard license agreement was therefore not probative of acceptance, "custom" or "practice," because McDonald's was contractually obligated to assist the operator to cure the violation. It could not institute default proceedings until its field service had expended

"maximum effort" in providing assistance to the operator. Nor is the offer probative of disparate enforcement, because the standard licensees had paid for this predefault assistance by paying a correspondingly higher royalty fee to McDonald's.

Under the materially different developmental contract negotiated by Dayan, those same service obligations were never incurred by McDonald's and Dayan was therefore not entitled to the same QSC enforcement procedures or predefault assistance. The formal written notice and franchisee payment requirements contained in the service provisions of the Dayan contract effectively preclude a construction that McDonald's was obligated to unilaterally send advisors to Dayan at its own expense as it did in the case of its standard licensees.

Evidence of a course of dealings under a contract which does not contain the same provisions as the contract in issue is generally held to be irrelevant and inadmissible. (*Marcus v. S.S. Kresge Co.* (1936), 283 Ill. App. 556, 571; *Humana, Inc. v. Fairchild* (Ky. 1980), 603 S.W.2d 918, 921; *Mister Filters, Inc. v. Weber Environmental Systems* (1974), 44 App. Div. 2d 639, 640-41, 353 N.Y.S.2d 835, 838.) Here, the service provisions of the contracts were clearly different, with a resulting difference in QSC enforcement and termination procedures. Accordingly, the trial court properly rejected plaintiff's offer of proof based upon the materially different service provisions of the standard license agreement and Dayan's MLA.

B. *HUISSIER* REPORTS

■ Next, plaintiff argues that the trial court erred in admitting into evidence the reports of several French court officials that had conducted inspections of his restaurants pursuant to orders by the High Court in Paris issued in connection with McDonald's French lawsuit. Dayan attacks the credibility, competence and admissibility of the testimony and reports of these French court officials.

The record reveals that five *huissiers de audiencier*, Delatre, Lachkar, Adam, Petit, and Linee, were specifically appointed and ordered by the Paris court to conduct inspections of Dayan's restaurants in April and September of 1978. Under the French legal system, the court determines facts from reports submitted by *huissiers* and not from oral testimony. All five of these French court officials held the special title of *"Huissier de Justice Audiencier,"* which indicates that they work for the court system and receive their assignments directly from the court. *Huissiers* that are not *"audiencier"* receive their assignments from and work at the request of a private party.

The record further reveals that the mission of any *huissier* is to

relate to the court the facts in dispute with objectivity and with the highest regard for the truth by making the observations directed and preparing an official report. However, a *huissier's* report prepared at the instance of a private party is limited by the specific requests and instructions of the retaining individual. In contrast, a court-appointed *huissier de audiencier* receives his instructions from the judge, who establishes the mission of the *huissier* and the facts that the *huissier* is to bring back to the court. Accordingly, the *huissers de audiencier* testified at trial that they enjoy the "utmost confidence" of the court and that greater deference is normally accorded to their reports.

In the present case, each *huissier*, accompanied by a McDonald's field service technician, performed inspections in certain of Dayan's restaurants, each lasting 10 to 12 hours. During the inspection each *huissier* took detailed notes of his personal observations concerning cleanliness, cooking procedures, service procedures, the finished products, specific equipment temperatures, cooking times, product holding times, customer service times and similar observations. Numerous photographs were also taken at the direction of the *huissier* performing the inspection. Shortly after the inspection, each *huissier* prepared an official court-ordered report. All of the *huissiers* testified that they carefully compared the official report to the field notes in order to insure the accuracy of the final report.

Plaintiff argues that the testimony and reports of the court-appointed *huissiers* were biased and insufficiently credible and should have been rejected by the trial court. We disagree.

The credibility of witnesses and the weight to be given their testimony are matters within the province of the trial judge who, as the trier of fact, is in a position superior to a court of review to observe the conduct of witnesses while testifying. (*Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, 226 N.E.2d 624.) Where the trial court has seen and heard the witnesses, a court of review will not disturb findings of fact unless they are manifestly against the weight of the evidence. (*Brown v. Zimmerman* (1959), 18 Ill. 2d 94, 102, 163 N.E.2d 518.) For findings to be against the manifest weight of the evidence, it must appear that conclusions opposite to those reached by the trial court are clearly evident. *Emmenegger Construction Co. v. King* (1982), 103 Ill. App. 3d 423, 427, 431 N.E.2d 738.

Here, the trial court made specific findings that the five *huissiers* were objective, impartial, honest, and worthy of high credibility. The trier of fact had ample opportunity to assess the credibility of these witnesses, since their testimony consumed more than nine full days of trial. The court also listened to weeks of corroborating testimony and

received in evidence over 1,000 corroborating photographs. After reviewing the record and the evidence of impeachment called to our attention, we cannot say that conclusions opposite to those reached by the trial court are clearly evident. Plaintiff's attempt to characterize the five *huissiers* as agents of McDonald's preparing reports for litigation is not borne out by the record. The *huissiers* were not privately retained by McDonald's but were appointed by the French court to obtain information the court had requested. The fact that McDonald's had petitioned the French court resulted in McDonald's having to bear the cost of the *huissier* inspections and reports by paying a fee to each *huissier* for his work. Contrary to plaintiff's assertion, this arrangement does not render the *huissiers'* testimony or reports incapable of belief.

■ Dayan also contends that the *huissier* reports were hearsay and were erroneously admitted into evidence as past recollection recorded. We disagree.

Generally, a document is admissible in evidence under the past recollection recorded exception to the hearsay rule if the following four requirements are met: (1) the witness must have had firsthand knowledge of the event recorded; (2) the written statement must be an original statement made at or near the time of the event; (3) the witness must lack any present recollection of the event; and (4) the witness must vouch for the accuracy of the memorandum. (*Johnson v. City of Chicago* (1981), 103 Ill. App. 3d 646, 647-48, 431 N.E.2d 1105.) In determining the admissibility of a document under this hearsay exception, the court should be primarily concerned with the reliability of the proffered document and apply the above criteria accordingly. *People v. Olson* (1978), 59 Ill. App. 3d 643, 647, 375 N.E.2d 533.

Dayan's main contention revolves around the fact that the reports used at trial were not the original field notes recorded contemporaneously by each *huissier* but rather a report produced from the original notes a short time later. As such, Dayan argues that the second requirement of "an original statement made at or near the time of the event" had not been met.

Initially, we note that each court-appointed *huissier* testified at length from their present recollection or from their present recollection as refreshed by their reports and photographs as to their observations of cleanliness, employee appearance and performance, the condition of the equipment, the presence or absence of equipment, cooking and service procedures and the finished products as prepared and served. Those portions of the *huissier* reports offered as past recollection recorded were, for the most part, limited to numerical find-

ings of equipment temperatures, product holding times, cooking times, and other quantitative data which was directly copied into the reports from entries made in the original field notes. The original field notes were destroyed,[3] but the subsequently prepared reports qualify as a "copy" of those original field notes, at least when restricted to the numerical observations and quantitative data transcribed from the original notes.

We find the trial court properly admitted these portions of the *huissiers'* reports in evidence as past recollection recorded. The underlying rationale for this hearsay exception relies on the fact that the proffered document contains sufficient circumstantial guarantees of trustworthiness and reliability because the recorded recollection was prepared at or near the time of the event while the witness had a clear and accurate memory of it. (McCormick, Evidence sec. 299, at 712 (2d Ed. 1972).) Under these circumstances, the reliability of the evidence is perceived to outweigh the inherent testimonial infirmities of hearsay occasioned by the inability of the opposing party to effectively cross-examine. Clearly, the original contemporaneous memorandum is preferable to a copy since inaccuracies may occur in the transcription process. However, where the original memorandum is unavailable, a transcribed copy setting forth the observations originally recorded has been held to be admissible where the offered document is sufficiently reliable. (*O.S. Richardson Fueling Co. v. Seymour* (1908), 235 Ill. 319, 323, 85 N.E. 496; *Jackson v. Jackson* (1974), 24 Ill. App. 3d 810, 813, 321 N.E.2d 506; *Employers' Liability Assurance Corp. v. Kelly-Atkinson Construction Co.* (1915), 195 Ill. App. 620, 632.) We further note that the four requirements given in *Johnson v. City of Chicago* (1981), 103 Ill. App. 3d 646, 648, 431 N.E.2d 1105, and other Illinois cases originally were taken from McCormick, Evidence sec. 299, at 712 (2d Ed. 1972). In explaining the original document requirement, McCormick states that the original memorandum must be produced "unless it is unavailable, in which case a copy may be used." (McCormick, Evidence sec. 301, at 713 (2d Ed. 1972).) Thus, there exists adequate authority for the admission of a transcribed copy of the original memorandum under past recollection recorded.

Here, the *huissiers'* observations were initially recorded precisely

---

[3]In France, only the official reports, not the field notes, have status and the field notes are normally discarded. French law requires that the official report be kept for 30 years. At trial, in addition to the official reports, portions of *Hussier* Adam's notes were available and were admitted into evidence.

at the time they were made; the official reports were prepared shortly after the inspections directly from the original notes and contain the same observations; the absence of the original notes is explained by custom, not fraud or mischief; and the *huissiers'* reports are the best evidence available for the numerical observations of times, temperatures, and other quantitative data obtained during the inspections. After considering these factors, we find that the reports bore sufficient *indicia* of reliability to be admitted into evidence as past recollection recorded even though they were essentially copies of the original memorandum.

■ Any error occasioned by admitting nonnumerical data contained in the reports was harmless. In general, any such data was also the subject of trial court testimony by the *huissiers* based on present recollection as refreshed by the reports and photographs and was therefore subject to cross-examination by plaintiff. Also, the *huissiers'* testimony and that of McDonald's technicians, together with the laboratory findings and photographs, presented during 65 full days of trial, overwhelmingly established Dayan's complete disregard of McDonald's QSC standards without need of any reference to the hearsay reports. Error in admitting incompetent evidence does not require reversal if the evidence has not materially affected the outcome of the trial and there is sufficient competent evidence to sustain the judgment of the court. (*Cummings v. Chicago Transit Authority* (1980), 86 Ill. App. 3d 914, 920, 408 N.E.2d 737; *In re Wheeler* (1980), 86 Ill. App. 3d 564, 569, 408 N.E.2d 424.) Accordingly, we reject plaintiff's argument that the admission of the *huissiers'* reports constituted reversible error.

III. GOOD FAITH STANDARD

■ Dayan also argues that the trial court applied an erroneous legal standard in determining whether the franchisor, McDonald's, acted in good faith and proper motive in terminating the franchise agreement. Dayan contends that the trial court confused the distinction between the two separate legal doctrines of good faith and improper motive. In response, McDonald's argues that motive is irrelevant where good cause for termination exists and that it acted in good faith under the most stringent of standards. A resolution of these contentions will necessarily entail an examination of the relationship between good faith and motive and the applicability of these concepts to the case at bar.

In Illinois, as in the majority of American jurisdictions, a covenant of good faith and fair dealing is implied in every contract absent ex-

press disavowal. (*Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 286, 154 N.E.2d 683; *Foster Enterprises, Inc. v. Germania Federal Savings & Loan Association* (1981), 97 Ill. App. 3d 22, 28, 421 N.E.2d 1375; see generally Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harv. L. Rev. 369 (1980).) Problems relating to good faith performance typically arise where one party to the contract is given broad discretion in performance. The dependent party must then rely on the party in control to exercise that discretion fairly.

This principle is demonstrated in a series of Illinois cases examining the duty of a contracting party to use reasonable efforts to bring about a condition precedent. (*Osten v. Shah* (1982), 104 Ill. App. 3d 784, 433 N.E.2d 294; *Central National Bank v. Fleetwood Realty Corp.* (1982), 110 Ill. App. 3d 169, 441 N.E.2d 1244; *Pierce v. MacNeal Memorial Hospital Association* (1977), 46 Ill. App. 3d 42, 360 N.E.2d 551; *Dasenbrock v. Interstate Restaurant Corp.* (1972), 7 Ill. App. 3d 295, 287 N.E.2d 151.) In all of these cases, the contractual obligation of one party was contingent upon a condition peculiarly within the power of that party, such as obtaining mortgage financing or obtaining necessary licenses or permits. Thus the controlling party could have avoided incurring any contractual obligation by refusing to bring about the relevant condition. In each case, the court held that the controlling party's discretion was limited by the implied covenant of good faith and therefore the party was obligated to use reasonable efforts to bring about the condition.

A similar check on the exercise of contractual discretion was developed in a series of employee termination cases. (*Cuerton v. Abbott Laboratories, Inc.* (1982), 111 Ill. App. 3d 261, 443 N.E.2d 1069; *Criscione v. Sears, Roebuck & Co.* (1978), 66 Ill. App. 3d 664, 384 N.E.2d 91; *Stevenson v. ITT Harper, Inc.* (1977), 51 Ill. App. 3d 568, 366 N.E.2d 561.) In each of the foregoing cases a discharged employee brought suit against a former employer alleging that the employer was inspired by an improper motive, such as a desire to deprive the employee of health or pension benefits, and therefore the termination was in bad faith. The court, in each instance, recognized that the implied covenant of good faith could limit an employer's otherwise unrestricted discretion in terminating an at-will employment contract. However, in every case, the employee failed either to properly plead or to prove that the employer had acted in bad faith out of an improper motive.

As the above authorities demonstrate, the doctrine of good faith performance imposes a limitation on the exercise of discretion vested

in one of the parties to a contract. (See also *Foster Enterprises, Inc. v. Germania Federal Savings & Loan Association* (1981), 97 Ill. App. 3d 22, 30, 421 N.E.2d 1375.) In describing the nature of that limitation the courts of this State have held that a party vested with contractual discretion must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. (*Foster Enterprises, Inc. v. Germania Federal Savings & Loan Association* (1981), 97 Ill. App. 3d 22, 30-31, 421 N.E.2d 1375; *Pierce v. MacNeal Memorial Hospital Association* (1977), 46 Ill. App. 3d 42, 51, 360 N.E.2d 551.) The cases reviewed also reveal that, contrary to plaintiff's contention, improper motive has no separate doctrinal basis apart from the implied covenant of good faith performance. Where a party acts with improper motive, be it a desire to extricate himself from a contractual obligation by refusing to bring about a condition precedent or a desire to deprive an employee of reasonably anticipated benefits through termination, that party is exercising contractual discretion in a manner inconsistent with the reasonable expectations of the parties and therefore is acting in bad faith. It remains to be seen, however, what limitation the implied covenant of good faith imposes on franchisor discretion in terminating a franchise agreement.

Our research reveals no reported cases in Illinois specifically addressing this point. However, in *Seegmiller v. Western Men, Inc.* (1968), 20 Utah 2d 352, 437 P.2d 892, the Utah Supreme Court held that the implied covenant of good faith limited the power of the franchisor to terminate a franchise agreement without good cause where, by its terms, the franchise was terminable upon 60 days' written notice to the franchisee. The court stated that

"*** when parties enter into a contract of this character, and there is no express provision that it may be cancelled without cause, it seems fair and reasonable to assume that both parties entered into the arrangement in good faith, intending that if the service is performed in a satisfactory manner it will not be cancelled arbitrarily." (20 Utah 2d 352, 354, 437 P.2d 892, 894.)

Similarly, in *Atlantic Richfield Co. v. Razumic* (1978), 480 Pa. 366, 390 A.2d 736, the court applied the principles of good faith and commercial reasonableness and concluded that a franchisor could not terminate a franchise agreement arbitrarily without just cause. The courts in *Shell Oil Co. v. Marinello* (1973), 63 N.J. 402, 307 A.2d 598, *cert. denied* (1974), 415 U.S. 920, 39 L. Ed. 2d 475, 94 S. Ct. 1421, and *Ashland Oil, Inc. v. Donahue* (W. Va. 1976), 223 S.E.2d 433, went

further, refusing to enforce express contractual provisions authorizing petroleum suppliers to terminate franchise agreements with their dealers without good cause.

These cases reflect judicial concern over longstanding abuses in franchise relationships, particularly contract provisions giving the franchisor broad unilateral powers of termination at will. Taken collectively, they stand for the proposition that the implied covenant of good faith restricts franchisor discretion in terminating a franchise agreement to those cases where good cause exists. See Hewitt, *Good Faith or Unconscionability—Franchisee Remedies for Termination,* 29 Bus. Law. 227 (1973).

Concern over franchise abuses has not only been judicial. The legislatures of several States have enacted statutes specifically aimed at the franchise relationship and the protection of the franchisee. (See generally Annot., 67 A.L.R.3d 1299 (1975).) Illinois has adopted the Franchise Disclosure Act (Ill. Rev. Stat. 1981, ch. 121½, par. 701 *et seq.*), which mandates franchisor disclosure of information described in the Act to prospective franchisees. Subsequent amendments to the act (Pub. Act 81—426, renumbered Pub. Act 81—1509) placed restraints upon the franchisor's right to terminate the relationship. Section 4.3 (Ill. Rev. Stat. 1981, ch. 121½, par. 704.3) prohibits the termination of a franchise agreement by a franchisor except for "good cause" and contains the following definition:

> " 'Good cause' shall include, but not be limited to, the failure of the franchisee or subfranchisor to comply with any lawful provision of the franchise or other agreement and to cure such default after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be more than 30 days." (Ill. Rev. Stat. 1981, ch. 121½, par. 704.3(b)).)

While this legislation has not been given retroactive application (*cf. McAleer Buick-Pontiac Co. v. General Motors Corp.* (1981), 95 Ill. App. 3d 111, 113-14, 419 N.E.2d 608, construing the renewal provisions of the Motor Vehicle Franchise Act (Ill. Rev. Stat. 1981, ch. 121½, par. 751 *et seq.*) and refusing to give retroactive application) and is therefore not applicable to the case at bar, the act is relevant as an embodiment of the applicable public policy. Accord, *Atlantic Richfield Co. v. Razumic* (1978), 480 Pa. 366, 380-81, 390 A.2d 736, 743; *Shell Oil Co. v. Marinello* (1973), 63 N.J. 402, 409, 307 A.2d 598, 602, *cert. denied* (1974), 415 U.S. 920, 39 L. Ed. 2d 475, 94 S. Ct. 1421.

Clearly, the good-faith restrictions on franchise termination imposed by judicial authority in other jurisdictions and those imposed by

our legislature concur—a franchisor may not terminate a franchise agreement except where good cause exists. Good cause has been defined as a failure to substantially comply with obligations under the agreement. (*Shell Oil Co. v. Marinello* (1973), 63 N.J. 402, 410-11, 307 A.2d 598, 603, *cert. denied* (1974), 415 U.S. 920, 39 L. Ed. 2d 475, 94 S. Ct. 1421; accord, Ill. Rev. Stat. 1981, ch. 121½, par. 704.3(b).) One commentator has also noted that the test used by most courts in defining good cause seems to center on a determination of commercial reasonability. Breaches of contract affecting the interest of the franchisor in marketing his product constitute good cause for termination. See Fine, *Recent Developments in State Law Affecting Franchising*, 1980 Ariz. St. L.J. 547, 558-59.

However, plaintiff would have us go further and argues that even if McDonald's had good cause for termination, if it also had an improper motive the termination would be a breach of the implied covenant of good faith. Dayan would attribute to McDonald's a desire to recapture the lucrative Paris market as an impermissible motive. We cannot agree that the doctrine of good faith performance warrants this additional restriction on franchisor discretion.

Initially, we note that no case has been cited nor has our research revealed any case where a franchise termination for good cause was overcome by the presence of an improper motive. As a general proposition of law, it is widely held that where good cause exists, motive is immaterial to a determination of good faith performance. Corbin on Contracts states:

> "The most widely recognized privilege to act regardless of motive is furnished by the existence of *good cause*. There are myriads of cases recognizing that good cause to take particular action will constitute a defense to a finding that the actor is in bad faith." (Emphasis in original.) (3A Corbin on Contracts sec. 654D, at 664 (Supp. 1982).)

and also

> "Where there is good cause, there is no bad faith." (6 Corbin on Contracts sec. 1266, at 368 (Supp. 1982).)

This principle is also in accord with the view that the good faith doctrine should protect the reasonable expectations of the franchisee with regard to the exercise of discretionary termination rights by the franchisor. Where the franchisee is in substantial breach of the franchising agreement, particularly where the nature of the breach logically affects the interest of the franchisor in marketing its product, no legitimate expectations of the franchisee are violated by termination regardless of what other motives the franchisor might have. (See also

*Palombi v. Getty Oil Co.* (E.D. Pa. 1980), 501 F. Supp. 158, where the court held that if the franchisor can show at least one legally sufficient reason to terminate, the termination is valid.) Accordingly, we hold that the implied covenant of good faith only requires that the franchisor have good cause for termination.

We find no reversible error with respect to the standard applied by the trial court in the case at bar. Our review of the court's memorandum opinion reveals that initially the court applied a test in accord with the holdings stated in the present opinion. After finding good cause for termination existed, the trial court considered plaintiff's improper motive theory and found that McDonald's sole motive for termination was Dayan's failure to maintain QSC standards. If anything, the trial court's scrutiny of this franchise termination exceeded the requirements imposed by our above holding.

IV. TRIAL COURT FINDINGS OF FACT

■ Finally, plaintiff contends that the trial court improperly resolved certain factual issues in favor of McDonald's. Specifically, plaintiff argues that the following findings of fact are contrary to the manifest weight of the evidence: (1) that McDonald's terminated the franchise agreement in good faith; (2) that McDonald's conduct did not amount to a breach of its contractual obligation to provide assistance to the franchisee; (3) that McDonald's did not violate established termination procedures; and (4) that McDonald's did not waive its right to demand strict compliance.

The deference accorded a trial court's findings of fact on appellate review is too well settled to be the subject of serious dispute. The findings of the trial court will not be disturbed unless manifestly against the weight of the evidence. (*Brown v. Commercial National Bank* (1969), 42 Ill. 2d 365, 371, 247 N.E.2d 894; *Emmenegger Construction Co. v. King* (1982), 103 Ill. App. 3d 423, 427, 431 N.E.2d 738.) As we have previously stated, for a finding to be contrary to the manifest weight of the evidence, it must appear that conclusions opposite to those reached by the trier of fact are clearly evident. (*Emmenegger Construction Co. v. King* (1982), 103 Ill. App. 3d 423, 427, 431 N.E.2d 738.) Here, we do not find this to be the case with respect to any of the contentions raised by plaintiff.

Dayan argues that circumstantial evidence presented at trial indicated that McDonald's sole motive in terminating the MLA was a desire to recapture the lucrative Paris market. He takes issue with the trial court's finding that "it is the QSC violations which have actuated the termination mechanism of the MLA and nothing else" and argues

that the evidence of McDonald's bad motive rendered a finding of good faith termination clearly erroneous.

Initially, we note that the trial court has unambiguously resolved the bad motive issue in favor of McDonald's. However, any extended discussion of motive is unnecessary in view of our holding on good faith termination of a franchise agreement. If McDonald's had good cause for termination as evidenced by substantial noncompliance with QSC standards, then the termination was made in good faith regardless of what other motives McDonald's may have had. Thus the scope of our inquiry is necessarily reduced to a determination of whether or not the evidence presented at trial warrants a finding of substantial noncompliance with QSC standards.

Our review of the evidence admits of no doubt; the trial court properly resolved this issue in favor of McDonald's. To characterize the condition of Dayan's restaurants as being in substantial noncompliance with McDonald's QSC standards is to engage in profound understatement. Throughout trial the various witnesses struggled to find the appropriate words to describe the ineffably unsanitary conditions observed in these restaurants, as did the trial court in its memorandum opinion. Terms describing the uncleanliness—such as "indescribable," "extremely defective sanitary conditions," "filthy, grimy, cruddy," "deplorable," "significantly unsanitary," "contaminated," "insanitary," "very dirty," "very, very dirty," "disgusting," "abundance of filth," "pig pens"—tell only part of the story. The accuracy of these epithets is supported by voluminous, detailed testimonial evidence which consumed many weeks of trial and thousands of pages of transcript and is also corroborated by over 1,000 photographs admitted in evidence at trial. The trial court described this evidence as a "staggering number of minute facts." The conditions of filth were so widespread and reported by so many persons that any attempt to catalog them all would only unduly lengthen this opinion. Suffice it to say, we find more than ample evidence of record to support the trial court's finding of substantial noncompliance with McDonald's QSC standards.[4] We further find plaintiff's limited attempts to discredit this evidence based on a lack of corroborating written reports in the early years to be singularly unavailing. Accordingly, we find no error with respect to the trial court's determination that McDonald's terminated the franchise agreement for good cause and in good faith.

---

[4]In addition to cleanliness deficiencies, the trial court also found "countless violations of food quality standards and service-to-customer standards" which by themselves would have constituted good cause for termination.

■ Dayan also argues that McDonald's was obligated to provide him with the operational assistance necessary to enable him to meet the QSC standards. He further contends that McDonald's failed to fulfill his request for assistance and that the trial court's findings to the contrary were against the manifest weight of the evidence.

As we have previously noted, the extent of McDonald's service obligation to Dayan was expressly addressed in Articles 8.3 and 8.4 of the MLA. Dayan was to pay a 1% royalty on gross receipts and receive no service unless he first requested it in writing, McDonald's overseas personnel were available to render service, and Dayan paid for the service. We have already thoroughly examined the extensive service provided standard licensees under a 3% royalty contract and contrasted this service agreement with the one negotiated by Dayan. Accordingly, we find little merit in plaintiff's present suggestion that he was entitled to the same type of predefault assistance as a standard licensee absent a specific written request and a willingness to bear the cost of such assistance. Our analysis of plaintiff's contention will therefore require us to determine only whether the evidence adduced at trial supports the trial court's finding that McDonald's fulfilled any request for assistance made by Dayan.

During the first five years of the MLA, Dayan consistently refused to request any operational assistance even though several McDonald's employees testified that they urged him to do so after observing the disgraceful condition of his restaurants. Following the inspections of Allin and Sollars in February 1977 and after being advised by Barnes that McDonald's would no longer tolerate his substandard operation, Dayan verbally asked Sollars for a French-speaking operations person to work in the market for six months. Sollars testified that he told Dayan it would be difficult to find someone with the appropriate background who spoke French but that McDonald's could immediately send him an English-speaking operations man. Sollars further testified that this idea was summarily rejected by Dayan as unworkable even though he had informed Dayan that sending operations personnel who did not speak the language to a foreign country was very common and very successful in McDonald's international system. Nonetheless, Sollars agreed to attempt to locate a qualified person with the requisite language skills for Dayan.

While Sollars was in the process of conducting his search, Dayan met Mr. Fox, another executive at McDonald's International, and discussed his operational difficulties with him. Fox urged Dayan to make a formal written request for assistance. In a letter dated June 20, 1977, Dayan asked McDonald's for a "french speaking ops. man, who

could work full-time for us" or, in the alternative, "if we cannot find a full-time person, I would appreciate your assigning an ops. man who could spend 6 months or so in Paris." Dayan stated the "mission" of the person for whom he was looking "would be to run our training center on a full time basis." Fox initiated a computer search for McDonald's personnel with the appropriate operational background and language abilities. On October 26, 1977, Fox sent a letter to Dayan with the names, addresses, and telephone numbers of three persons revealed by the computer search to have the proper qualifications and whom Fox had determined would be interested in relocating in Paris and working for Dayan full-time.

However, by this time Sollars' independent search for a French-speaking operations man had borne fruit. Through Sollars' efforts, Dayan was put in contact with Michael Maycock, a person with McDonald's managerial and operational experience who spoke French. Dayan testified that he hired Maycock some time in October 1977 and placed him in charge of training, operations, quality control, and equipment. Dayan further testified that Maycock continued in his employ as of the time of trial, more than four years after being hired. Dayan could not recall receiving Fox' letter and never contacted any of the three people named therein.

We believe this evidence adequately supports the finding of the trial court that Dayan's "severely qualified and isolated request for an operations man *** rings false." As the trial court correctly realized:

> "It does not take a McDonald's trained French speaking operational man to know that grease dripping from the vents must be stopped and not merely collected in a cup hung from the ceiling, that dogs are not permitted to defecate where food is stored, that insecticide is not blended with chicken breading, that past-dated products should be discarded, that a potato peeler should be somewhat cleaner than a tire-vulcanizer and that shortening should not look like crank case oil."

Clearly, Maycock satisfied Dayan's request for a French-speaking operations man to run his training program. This is evidenced by Maycock's continuing employment in this capacity and Dayan's subsequent failure to contact any of the three people referred to him by Fox. The finding that Dayan refused non-French-speaking operational assistance and that McDonald's fulfilled Dayan's limited request for a French-speaking operational employee is well supported by the record. To suggest, as plaintiff does, that an opposite conclusion is clearly evident is totally without merit. Accordingly, we find McDonald's fulfilled its contractual obligation to provide requested opera-

tional assistance to Dayan.

Plaintiff further claims that the trial court failed to consider "overwhelming evidence that McDonald's violated its established procedures in termination here." Plaintiff argues that "there is no evidence that the absence of a 3% standard service agreement removed McDonald's obligation to follow customary *termination procedures*." (Emphasis in original.)

What Dayan characterizes as "termination procedures" is nothing more than the extensive inspection and instruction given to noncomplying standard licensees under the 3% license agreement in order to assist them in meeting QSC standards. Contrary to plaintiff's contention, the MLA negotiated by him explicitly stated what he had to do if he wished such assistance; he had to request it in writing and pay for it. Accordingly, we reject Dayan's argument that he was entitled to the same operational assistance prior to termination as the standard licensee. The record reveals no such request and, as previously discussed, the limited request for assistance Dayan did make was fulfilled by McDonald's.

Dayan also takes issue with the trial court's finding that McDonald's did not waive its right to demand strict compliance with QSC standards and it should not be estopped from terminating the MLA. However, we note that throughout trial plaintiff maintained he was in substantial compliance with QSC standards and that McDonald's had manufactured a case against him in order to recapture the Paris market. Consistent with this litigation posture, he failed to properly plead either waiver or estoppel.

■ The trial court found that neither doctrine was "set out in the pleadings nor the subject of any proof." Both waiver and estoppel are affirmative defenses which must be specially pleaded or they are waived. (*Estes Co. v. Employers Mutual Casualty Co.* (1980), 79 Ill. 2d 228, 236, 402 N.E.2d 613; *Orchard Brook Home Association, Inc. v. Joseph Keim Land Development Corp.* (1978), 66 Ill. App. 3d 227, 233-34, 382 N.E.2d 818; *Hartford Accident & Indemnity Co. v. D.F. Bast, Inc.* (1977), 56 Ill. App. 3d 960, 962, 372 N.E.2d 829; Ill. Rev. Stat. 1981, ch. 110, par. 2—613(d).) Even if there were evidence to support these affirmative defenses, and here we find very little, it would not overcome plaintiff's pleading omission. (See *Hunsley v. Aull* (1944), 387 Ill. 520, 523, 56 N.E.2d 773; *Terminal Freezers, Inc. v. Roberts Frozen Foods* (1976), 41 Ill. App. 3d 981, 984, 354 N.E.2d 904; *Economy Truck Sales & Service, Inc. v. Granger* (1965), 61 Ill. App. 2d 111, 116, 209 N.E.2d 1.) Accordingly, we find plaintiff has waived these defenses by failing to sufficiently plead them.

In view of the foregoing reasons, the judgment of the trial court denying plaintiff's request for a permanent injunction and finding that McDonald's properly terminated the franchise agreement is affirmed.

Affirmed.

McGLOON and GOLDBERG, JJ., concur.