**McDONALD'S CORPORATION,**
a Delaware corporation,
Plaintiff,

v.

**C.B. MANAGEMENT CO., INC., an Ohio**
corporation doing business in Ohio,
Defendant.

No. 97 C 6176.

United States District Court,
N.D. Illinois,
Eastern Division.

April 1, 1998.

payments of amounts due under the franchise agreement constituted a material breach of the franchise agreement's warranting termination. On December 4, 1997, CB answered by filing a motion under Fed. R.Civ.P. 56(f) to postpone review of McDonald's summary judgment motion pending discovery. On December 22, 1997, McDonald's filed a motion to dismiss CB's counterclaims. CB responded by filing opposition briefs to both the summary judgment motion and the motion to dismiss, challenging each on the merits (but not withdrawing its 56(f) motion). In addition, on January 8, 1998, CB filed a motion to compel production of documents from McDonald's. For the reasons stated herein we grant McDonald's motion for summary judgment in part and continue it in part, and we grant its motion to dismiss CB's counterclaims. We deny CB's Rule 56(f) motion and dismiss its motion to compel as moot

Eric A. Oesterle, Alan H. Silberman, Sonnenschein, Nath & Rosenthal, Chicago, IL, for Plaintiff.

James J. Riebandt, Riebandt & Dewald, P.C., Arlington Heights, IL, Robert M. Einhorn, Omar J. Arcia, Zarco & Pardo, P.A., Miami, FL, Robert Zarco, Zarco & Associates, Miami, FL, for Defendant.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiff McDonald's Corporation (McDonald's) originally filed this action against defendant C.B. Management Co., Inc. (CB) on August 29, 1997, seeking injunctive and monetary relief for CB's alleged violation of its franchise agreement and illegal use of McDonald's trademarks. This court's jurisdiction arises under 28 U.S.C. § 1332, and 28 U.S.C. § 1338. On November 12, 1997, CB filed an answer and a two-count counterclaim asserting that McDonald's had breached the implied covenant of good faith and fair dealing and had violated the Illinois Franchise Disclosure Act, 815 ILCS 705, *et seq.* McDonald's then moved for summary judgment, arguing that CB's failure to make timely

## BACKGROUND

As we are faced here with a motion for summary judgment and a motion to dismiss, we must be mindful of the different standards of judging the facts. For the purposes of evaluating McDonald's summary judgment motion, we set forth the following undisputed facts. Plaintiff McDonald's is a Delaware corporation with its principal place of business in Oak Park, Illinois. Defendant CB is an Ohio corporation registered to do business and doing business in Ohio. Caesar Burkes (Burkes) is the president of CB.

On October 14, 1986, Burkes assigned to CB his interest in a franchise agreement and operator's lease, both dated February 28, 1986, which created the right to operate a McDonald's restaurant located at 10411 St. Clair Avenue, Cleveland, Ohio (St. Clair McDonald's). On December 29, 1992, Burkes assigned to CB his interest in a franchise agreement and operator's lease, both dated May 29, 1979, which created a similar right to operate a McDonald's restaurant located at 3050 Carnegie Avenue, Cleveland, Ohio (Carnegie McDonald's).

The franchise agreements governing the operation of the St. Clair and Carnegie Mc-

Donald's (hereinafter, franchise agreements) contained the following provisions relevant to McDonald's claims in this case:

> During the time of the franchise, CB was obligated to pay to McDonald's a monthly payment of 3.0% of monthly gross sales, and a monthly rental payment plus 8.5% of monthly gross sales in excess of amounts specified for given time periods. CB was also obligated to pay all real estate taxes and special and general assessments levied against the restaurants. (Plf.App.Exh. B1, Franchise Letter Agreement ¶ 4(c), (d)).

> CB agreed to submit bi-monthly statements of receipts, monthly operating statements and statistical reports in forms satisfactory to McDonald's, and any other financial, operating and other information and reports reasonably requested by McDonald's. (*Id.*, License Agreement ¶ 10; Operator's Lease § 3.03).

> The parties agreed that McDonald's could terminate the agreement in the event that any "service fee owing to [McDonald's] is not paid within thirty (30) days after the date such payment is due" or any "judgment or judgments aggregating in excess of $5,000.00 against [CB] or any federal, state or local tax lien in excess of $5,000.00 against [CB]'s property shall remain unsatisfied or unbonded of record in excess of thirty (30) days." The agreement further stated that if CB failed or delayed in making prompt payments of rent and service fees, McDonald's had the right to terminate the agreement. (*Id.*, License Agreement ¶ 18(c),(d), (m)).

> The parties agreed that amounts due to McDonald's as service fees and not paid should bear interest at the highest rate of interest permitted by law and that amounts due to McDonald's as rents, real estate taxes and similar payments and not paid should bear interest at the rate of ten percent (10%) per annum. (*Id.*, License Agreement ¶ 8; Operator's Lease § 3.05). "Upon termination" of the franchise agreement, CB was required to "discontinue the use of the McDonald's System and its associated trade names, service marks and trademarks," return to McDonald's all "material containing trade secrets, operat-

ing instructions or business practices," and to immediately deliver the premises to McDonald's. (*Id.*, License Agreement ¶ 20; Operator's Lease § 7.05).

> In the event of a material breach, McDonald's was given an immediate right to enter and take possession of the restaurants. (*Id.*, License Agreement ¶ 20(a); Operator's Lease § 7.04).

> CB granted McDonald's a lien upon all CB's property for "all rent and other sums due, from time to time, from [CB to McDonald's] under the provisions" of the lease. (*Id.*, Operator's Lease § 3.06).

> McDonald's was entitled to recover reasonable attorneys' fees, court costs, and litigation expenses associated with legal actions brought to protect its rights under the agreements. (*Id.*, License Agreement ¶ 23).

> McDonald's agreed to "make available to [CB] all additional services, facilities, rights and privileges which [McDonald's] makes generally available, from time to time, to all its licensees operating McDonald's Restaurants." (*Id.*, License Agreement ¶ 3).

On October 30, 1996, Burkes and CB filed a complaint in federal district court against McDonald's for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contractual relations, and civil rights violations. These allegations stemmed from the sale of Burkes' Cedar Lee McDonald's store to a white couple (the Pikkels). Burkes, who is an African American, alleged that McDonald's ordered him to reduce the store price for the benefit of the Pikkels, not because the price was unreasonable but because the Pikkels would not have been able to realize enough profit.

On January 14, 1997, Judge Suzanne B. Colon dismissed Burkes' and CB's lawsuit pursuant to Fed.R.Civ.P. 12(b). In doing so, the court found that since CB had already transferred its rights under the franchise agreement to the Pikkels, it could not maintain its claims for breach of contract and breach of the implied covenant. *Burkes v. McDonald's Corporation*, No. 96-C-7093, 1997 WL 28300 at 5 (N.D.Ill. Jan. 21, 1997) (CB mo.to file am.ans.exh.B). The court also

dismissed the remaining claims on the basis that they were time-barred under the applicable statutes of limitation. *Id.* at 7–9.

On July 25, 1997, McDonald's sent a notice of default to CB, informing it that it was in default under the terms of the franchise agreements for the Carnegie and St. Clair McDonald's for failure to pay McDonald's $223,576.83 in rent, service fees, real estate taxes and interests (cplt.exh.E). The notice also advised CB that it was in breach of the applicable franchise agreements because it failed to submit the financial statements for the restaurants required under the agreements. The notice gave CB the opportunity to cure all of its defaults by August 25, 1997, and, if it did not, its franchises would terminate on August 26, 1997 at 12:01 a.m. CB did not make the required payments by August 25 and McDonald's terminated its franchises.[1]

On September 6, 1997, CB tendered to McDonald's checks totaling $200,000. McDonald's returned those checks uncashed. CB also tendered other checks to McDonald's after the August 25, 1997 termination, and all of those checks were also returned. McDonald's has demanded that CB immediately vacate the premises of the Carnegie and St. Clair McDonald's. To this date, CB has refused to vacate.

There is a different version of the events set forth by CB. This version is important both because we must determine whether it creates a genuine issue of material fact that would preclude McDonald's motion for summary judgment, *Renovitch v. Kaufman,* 905 F.2d 1040, 1044 (7th Cir.1990), and, in evaluating McDonald's motion to dismiss CB's counterclaims, we are required to accept the well-pled factual allegations set forth by CB as true. *See Travel All Over the World, Inc. v. The Kingdom of Saudi Arabia,* 73 F.3d 1423, 1429 (7th Cir.1996). CB's factual account supplements the version already set forth in the following way.

On June 18, 1997, shortly after Burkes' lawsuit was dismissed by Judge Conlon, CB applied for a loan with the Franchise Mortgage Assistance Corporation (FMAC) in At-

lanta, Georgia, which would have permitted it to cure any amounts then owed to McDonald's and to remain current with all financial obligations on an ongoing basis. Prior to making the application, CB advised Jim Flaum (Flaum), McDonald's regional manager, that it intended to repay the outstanding sum and ongoing obligations from the FMAC loan. In its previous dealings with CB and other franchisee's, McDonald's had regularly consented to the subordination of its interests to those of the franchisee's chosen lending institution. Flaum failed to advise CB that McDonald's planned not to subordinate its interests to those of FMAC.

After CB had advised McDonald's regional office of the FMAC loan application, McDonald's regional comptroller, Kathy Swift (Swift), directly contacted the FMAC and was advised that the loan would take 60 to 90 days to process and that it contemplated a subordination of McDonald's interest. It was not until July 25, 1997, that McDonald's sent CB the notice of default indicating that McDonald's would not subordinate the subject loan. Reapplication for a loan without subordination would have taken an additional 60 to 90 days, which exceeded the 30–day cure period set forth in the notice.

On July 28, 1997, Flaum and Burkes attended a lunch meeting in Cleveland during which Flaum indicated that McDonald's would not pursue termination procedures, at least until CB's new loan application was processed. Despite this understanding, McDonald's terminated the franchise agreements on August 25, 1997, and four days later filed the instant complaint. When it learned of the termination, CB applied for a loan from National City Bank in Cleveland and was able to obtain this loan within ten days for $200,000. Using the proceeds from this loan, CB attempted to tender payment to McDonald's on September 5, 1997, and at various points thereafter, but the cashier's checks it tendered were all returned uncashed.

On August 29, 1997, McDonald's filed its complaint in this case. Count I seeks a

---

**1.** CB, of course, disputes that the termination was legal, but does not dispute that the fact that

it had failed to make payments and that the termination occurred.

declaration requiring CB to vacate the St. Clair and Carnegie McDonald's and otherwise comply with the contractual provisions regarding termination. Count II asks for declaratory, injunctive, and monetary relief for CB's alleged unauthorized use of McDonald's trade names, service marks, and trademarks in violation of the ·Lanham Act. Count III asks for all payments due under the franchise agreements which at the time of filing amounted to $270,607.59. On November 12, 1997, CB counterclaimed, stating that McDonald's had breached the implied covenant of good faith and fair dealing (Count I), and violated the Illinois Franchise Disclosure Act, 815 ILCS 705 (Count II). We turn now to address the motions generated in response to the complaint and counterclaims.

### DISCUSSION

**I. McDonald's Motion for Summary Judgment**

We first address McDonald's motion for summary judgment. A motion for summary judgment may be granted where the pleadings and evidence present no genuine issues of fact and the movant is consequently entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Renovitch,* 905 F.2d at 1044. The movant must point to those portions of the record that demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548. The reviewing court shall draw all reasonable inferences in favor of the non-movant. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). When it is clear that the plaintiff cannot carry her burden of persuasion at trial on one or more elements, summary judgment is appropriate for the defendant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is especially appropriate in a matter of contract interpretation where no issues of fact exist, because the language of the contract is unambiguous. *Grundstad v. Ritt,* 106 F.3d 201, 205 (7th Cir.1997).

■ McDonald's claims require that we interpret the language of the franchise agreements. Under Illinois law the starting point of any contractual analysis is the language of the contract itself.[2] In interpreting a contract our overriding concern is to give effect to the intent of the parties. *Church v. General Motors Corp.,* 74 F.3d 795, 799 (7th Cir.1996). If a contract is clear and unambiguous we must determine the intention of the parties "solely from the plain language of the contract" and may not consider extrinsic evidence outside the "four corners" of the document itself. *Tishman Midwest Management Corp. v. Wayne Jarvis, Ltd.,* 146 Ill.App.3d 684, 102 Ill.Dec. 538, 500 N.E.2d 431, 434 (1st Dist.1986).

McDonald's argues that it is entitled to summary judgment on Counts I, II and III of its complaint because CB violated the clear terms of the franchise agreements. Specifically, they argue ·that the undisputed facts demonstrate that CB failed to make payments for rent, service fees and real estate taxes due under the contract. The explicit terms of the agreements provide for such payments (plf.app.exh.B1; franchise letter agrmt. ¶ 4(c),(d)), and also state that the failure to timely make such payments constitutes a material breach of the contract justifying the termination of the franchise (license agrmt. ¶ 18). Although it did not have to do so under the explicit terms of the agreements, on July 25, 1997, McDonald's afforded CB a one-month cure period to make current its outstanding obligations. Nevertheless, CB failed to make payments by August 25, and the franchises were terminated. Upon

2. In cases involving contractual disputes, "Illinois law respects the contract's choice-of-law clause as long as the contract is valid." *Kohler v. Leslie Hindman, Inc.,* 80 F.3d 1181, 1185 (7th Cir.1996). Since the franchise agreement in this case provides that the "terms and provisions of this License shall be interpreted in accordance with and governed by the laws of the State of Illinois" (plf.app.exh.B1, license agrmt. ¶ 27), we will apply Illinois law.

termination, CB was required to immediately relinquish the properties and discontinue the use of all McDonald's trade names, service marks and trademarks (license agrmt. ¶ 20). It has admittedly failed to do so, continuing to operate the franchises and use McDonald's trade names, service marks and trademarks. Accordingly, McDonald's now seeks a $1,132,794.21 judgment as of November 19, 1997 (actual damages of $377,598.07 trebled under the Lanham Act, 15 U.S.C. § 1117(a)), together with any other amounts found due.

■■ CB makes several arguments in response. It initially contends that this court should deny or postpone McDonald's motion for summary judgment under Fed.R.Civ.P. 56(f). Rule 56(f) provides as follows:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

A party seeking the protection of Rule 56(f) must make a good faith showing that it cannot respond to the movant's affidavits. *United ed States v. All Assets and Equip. of West Side Bldg. Corp.,* 58 F.3d 1181, 1190 (7th Cir.1995). The rule requires the filing of an affidavit stating the reasons for a claimant's inability to submit the necessary material to the court. *Id.*

■ CB presents the declaration of Caesar Burkes,[3] in which he states the reasons why this court should at least postpone McDonald's summary judgment motion. To begin with, CB has not conducted any discovery of the merits of McDonald's claims, CB's affirmative defenses, or CB's counterclaims (Burke decl. ¶ 7). This has been due, according to CB, to McDonald's failure to comply with discovery requests and to attend scheduled depositions (CB 56(f) mo.at 3). According to Burkes, CB's proposed discovery would reveal that Burkes was misled by McDonald's regional manager, Flaum, that Mc-

Donald's would subordinate its interests to FMAC, that McDonald's contacted FMAC directly as part of its scheme to force CB out of the McDonald's System, that McDonald's typically consents to a subordination of its interests to those of the franchisee's chosen lending institution, and that Flaum led Burkes to believe that McDonald's would not pursue termination proceedings until CB's new loan was processed. On this basis, CB requests that resolution of McDonald's motion be postponed pending further discovery.

However, rather than demonstrate that CB cannot adequately respond to McDonald's summary judgment motion, we think the Burkes declaration accomplishes the opposite result. As is clear from the declaration, Burkes can attest to most of the relevant information himself. For example, CB does not need to depose Flaum in order to establish the fact that Burkes spoke with him after applying for the FMAC loan and advised him that CB intended to repay the outstanding balance with the proceeds from that loan. Burkes' declaration seems to sufficiently establish this for the purposes of responding to McDonald's summary judgment motion. Similarly, it seems unnecessary to defer our ruling based on Burkes' contention that discovery would reveal that Flaum gave Burkes assurances that McDonald's would not pursue termination procedures pending the new loan application (which did not require McDonald's subordination). Again, Burkes own statements would seem sufficient. Finally, Burkes would seem to possess the requisite first-hand knowledge of McDonald's alleged practice of repeatedly consenting to subordinate its interests to CB's lenders, rendering further discovery unnecessary for the purpose of evaluating this motion. Therefore, we deny CB's Rule 56(f) motion to deny or postpone McDonald's summary judgment motion.

CB also makes substantive arguments responding to the merits of McDonald's claims. First, it contends that there is at least a disputed issue of fact as to whether McDonald's exercised contractual discretion in

---

**3.** Burkes' statement is presented in the form of a declaration which, under 28 U.S.C. § 1746, satis-

fies the requirement for a sworn affidavit under Rule 56(f).

refusing to subordinate its interests to FMAC and in terminating the franchise agreements. CB argues that McDonald's exercised discretion in making these decisions since it had established a course of dealing with CB and similarly situated franchisees whereby it would regularly subordinate its interests in order to help struggling franchisees fulfill their financial obligations. This discretion, according to CB, is written into the franchise agreement. Specifically, the license agreements state that McDonald's would "make available to [CB] all additional services, facilities, rights and privileges which [McDonald's] makes generally available, from time to time, to all its licensees operating McDonald's Restaurants" (plf.app.exh.B1; license agrmt. ¶ 3). Since McDonald's had contractual discretion over subordination of its interests and termination of franchisees, it was, under Illinois law, required to exercise it in accordance with the implied covenant of good faith and fair dealing. CB asserts that McDonald's engaged in a retaliatory scheme to unfairly terminate its franchises and therefore abused its contractual discretion in violation of its obligation to act in good faith. This, CB concludes, precludes McDonald's summary judgment motion.

Under Illinois law a covenant of good faith and fair dealing is implied in every contract unless expressly disavowed. *Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 81 Ill.Dec. 156, 466 N.E.2d 958, 971 (1st Dist. 1984); *Foster Enterprises v. Germania Federal Sav. and Loan Ass'n*, 97 Ill.App.3d 22, 52 Ill.Dec. 303, 421 N.E.2d 1375, 1382 (3d Dist.1981). This covenant requires that contractual discretion be exercised reasonably and not arbitrarily or capriciously. *Greer Properties, Inc. v. LaSalle Nat'l Bank,* 874 F.2d 457, 460 (7th Cir.1989). However, the covenant does not create an independent source of duties for the parties to a contract, *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1443 (7th Cir.1992); rather, it simply guides the construction of explicit terms in the agreement. *Echo, Inc. v. Whitson Co., Inc.,* 121 F.3d 1099, 1106 (7th Cir. 1997).

In this case the explicit terms of the agreement are clear: McDonald's had the right to terminate the franchises if CB failed to make prompt payments of rent and services fees due under the agreements (plf.app.exh. B1; license agrmt. ¶ 18). It is also clear that McDonald's was entitled to take possession of the franchises immediately following the failure to timely make payments, and was in no way obligated to provide any grace period beyond the contractually provided for cure period (license agrmt. ¶ 20). These terms are not ambiguous and do not confer discretion. Rather, they make clear that McDonald's had the unfettered "right" to terminate in the event of a material breach, defined to mean, *inter alia,* the failure to make timely payments of amounts owing under the agreements. This is not, therefore, a situation where the covenant of good faith must be implied to "fill the gap" in a contract where the terms offer insufficiently clear guides to interpretation. *Baxter Healthcare Corp. v. O.R. Concepts, Inc.,* 69 F.3d 785, 792 (7th Cir. 1995).

CB does not dispute that it failed to timely pay amounts due under the franchise agreements (Burkes decl. ¶ 11), nor does it dispute that the termination provisions described above were in effect at the time of its delinquency. Rather, it argues that the combination of the contractual language and McDonald's past actions created discretion with respect to two critical features of the parties' relationship: McDonald's choice whether to subordinate its security interest, and whether to terminate a franchisee behind in its payments. Specifically, CB argues that, although there is no explicit duty to subordinate or defer termination pending a franchisee's loan application, the contract terms (specifically ¶ 3 of the license agreement), confer discretion on McDonald's to subordinate, as it has done in the past with CB and other franchisees. McDonald's failure to exercise that discretion in good faith constituted a breach of the franchise agreements.

However, this argument is flawed. To begin with, ¶ 3 of the license agreement cannot be read to create discretion with respect to the issues of subordination and

termination. In the face of the clear contractual language governing termination, we decline to read ¶3 in such a way that would render the contract internally contradictory. *See Roubik v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 285 Ill. App.3d 217, 220 Ill.Dec. 764, 674 N.E.2d 35, 37 (1st Dist.1996). Furthermore, it has been held that ¶3 only relates to the "details of restaurant operations such as food, service and the supplying of standardized equipment." *Payne v. McDonald's Corp.,* 957 F.Supp. 749, 756 (D.Md.1997). Here, CB cannot use ¶3 to attempt to incorporate McDonald's subordination or termination practice as part of the actual contract as these issues are clearly outside the realm of restaurant operational procedures. Additionally, McDonald's failure to exercise its right to terminate "immediately" does not mean that its subsequent decision to terminate was therefore discretionary. The explicit terms of the agreement control this issue. Specifically, the agreements provide that "[n]o waiver by Licensor [McDonald's] of any breach or a series of breaches of this License shall constitute a waiver of any subsequent breach or waiver of the terms of this license" (plf.app.exh. B1; license agrmt. ¶21). Illinois courts strictly enforce these types of anti-waiver clauses. *See General Grocer Co. of Illinois v. Bachar,* 51 Ill.App.3d 907, 8 Ill.Dec. 720, 365 N.E.2d 1106, 1109 (3d Dist.1977) (finding that plaintiff's previous acceptance of tardy payments did not waive contract rights where anti-waiver clause required writing); *see also R.G. Ray Corp. v. Maynard Mfg. Co.,* No. 92–C–3708, 1993 WL 462841, at *6 n. 2 (N.D.Ill. Nov.8, 1993). Therefore, the fact that McDonald's may have declined to exercise its contractual right to terminate in the past does not somehow transform that *right* into a *discretionary decision* governed by the standard of good faith and fair dealing. McDonald's right to terminate was not modified by its past leniency, and there is no evidence indicating that Mc-

Donald's was not justified in exercising that right on August 25, 1997, after CB had failed to pay its outstanding contractual obligations.[4]

■ Neither does the fact that McDonald's may have acted with improper motive in retaliation for Burkes' previously filed lawsuit, render the franchise termination a bad faith exercise of discretion. CB attempts to establish improper motive by showing that McDonald's engaged in a pretextual scheme to terminate its franchises, demonstrated by its refusal to subordinate its interests to FMAC, its untimely default notice, and James Flaum's misleading statements to Burkes. However, it is well established that where there is good cause for a franchise termination, there can be no bad faith. *See Dayan,* 81 Ill.Dec. 156, 466 N.E.2d at 974 (quoting Corbin on Contracts, § 1266 at 368 (Supp.1982)). Nowhere does CB dispute that it had violated the terms of the franchise agreements by failing to make timely payments, and that this violation constituted a material breach. *Dayan* controls this point: "Where the franchisee is in substantial breach of the franchising agreement ... no legitimate expectations of the franchisee are violated by termination regardless of what other motives the franchisor might have." 81 Ill.Dec. 156, 466 N.E.2d at 974. Therefore, the fact that Flaum, Comptroller Kathy Smith and McDonald's may have been part of a pretextual scheme to terminate is of no consequence for the purposes of determining bad faith. The only relevant inquiry is whether McDonald's had good cause to terminate. Since there is no dispute that it did, CB cannot complain about McDonald's motive. *Id.*

■ Moreover, the covenant of good faith and fair dealing is properly understood as an "implied undertaking not to take opportunistic advantage in a way that could not have been contemplated" by the parties when a contract was drafted. *Baxter Healthcare,* 69

---

4. *Dunafon v. Taco Bell Corporation,* No. 93–C–4490 (W.D.Mo. Sept. 2, 1997) (CB opp.to mo.to dismiss, exh.A) does not help CB here. In that case the court found that a genuine issue of material fact existed as to whether an oral agreement or course of dealing existed which permit-

ted a franchisee's expansion. *Id.* at 4–6. That case is very different than here where an explicit written agreement governed the parties' conduct, and where it is undisputed that CB was terminated after clearly violating the contractual terms.

F.3d at 792; *see also Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 281 (7th Cir.1992). There is nothing to indicate that McDonald's has taken advantage of CB here. The parties were fully aware that at the time of contracting McDonald's retained the right to terminate in the event that any of the conditions specified in the franchise agreements came to pass. CB cannot now argue that McDonald's actions, in accordance with these provisions,. was in bad faith simply because McDonald's had from time to time decided to look the other way when CB violated the contract, in an effort to help CB stay afloat. McDonald's simply exercised privileges expressly reserved in the agreements and we may not interject the duty of good faith to rewrite the contract. *See Kham & Nate's Shoes No. 2 v. First Bank of Whiting,* 908 F.2d 1351, 1357 (7th Cir.1990); *see also Infomax Office Systems, Inc. v. MBO Binder & Co. of America,* 976 F.Supp. 1247, 1251 (S.D.Iowa 1997).

Thus, even if we accept the facts as alleged by CB—that Flaum knew of CB's attempt to obtain a loan from FMAC, that McDonald's refused to subordinate its interests, knowing that this would make compliance with the 30-day cure period set forth in the notice of default impossible,[5] and that Flaum indicated that McDonald's would not go forward with termination procedures pending CB's loan application—we must find that as a matter of law CB cannot show that McDonald's acted in bad faith and breached the franchise agreements. Accordingly, we find that CB cannot use the breach-of-contract argument to defeat McDonald's summary judgment motion. In addition, we think our finding with respect to the issue of good faith also resolves McDonald's motion to dismiss CB's counterclaim Count I, which raises the identical issue discussed here. Because, as we have stated, the facts as alleged by CB do not support a claim for breach of the implied covenant of good faith, we must grant McDonald's motion to dismiss counterclaim Count I.

Next, CB contends that its claim against McDonald's under the Illinois Franchise Disclosure Act (IFDA) precludes McDonald's summary judgment motion. Section 19 of the IFDA requires a franchisor to have good cause prior to terminating a franchisee. 815 ILCS 705/19. Good cause is defined as, but not limited to, "the failure of the franchisee to comply with any lawful provision of the franchise ... agreement after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be longer than 30 days." 815 ILCS 705/19(b). CB argues that McDonald's decision to terminate the St. Clair and Carnegie franchises was based on pretextual reasons and therefore without "good cause" under the IFDA, making summary judgment in McDonald's favor inappropriate.

McDonald's responds that the protections of the IFDA do not apply to the franchisees in this case, as they are not located within the State of Illinois. The IFDA states that "[i]t shall be a violation of this Act for a franchisor to terminate a franchised business *located in this state* ... except for 'good cause' ...." 815 ILCS 705/19 (emphasis added). Since the St. Clair and Carnegie McDonald's are located in Cleveland, Ohio, McDonald's contends that they do not fall within the ambit of the IFDA under the statute's explicit terms. CB rejoins that its claim under the IFDA is proper because, by agreeing to be bound by Illinois law, the parties necessarily made applicable the whole body of Illinois protective legislation irrespective of the territorial limitations contained in any particular statute.

The case law interpreting the application of state franchise statutes does not provide clear guidance on this point. As McDonald's points out, many courts have found the application of the IFDA and similar statutes to be strictly limited to franchises located within the home state. *See Highway Equipment Co. v. Caterpillar Inc.,* 908 F.2d 60, 62–64 (6th Cir.1990) (finding that IFDA did not apply to Ohio franchisee despite contractual choice-of-law provision specifying that Illinois

---

**5.** We point out that we find this allegation very dubious in light of the fact that CB was subsequently able to apply for and obtain a loan for

$200,000 from National City Bank within a ten-day period (Burkes decl. ¶ 15).

law governed); *Budget Rent–A–Car Corp. v. Shaffer, Inc.,* No. 91–C–2721, 1992 WL 137596, at *7–8 (N.D.Ill. June 2, 1992) (finding that IFDA did not apply to Alabama franchisee); *In re Montgomery Ward Catalog Sales Litigation,* 680 F.Supp. 182, 186 (E.D.Pa.1987) (finding IFDA not applicable to non-Illinois franchisee); *see also, Peugeot Motors of America, Inc. v. Eastern Auto Distributors, Inc.,* 892 F.2d 355 (4th Cir. 1989), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990) (denying Virginia franchisee protection of New York franchise law); *Bimel–Walroth Co. v. Raytheon Co.,* 796 F.2d 840 (6th Cir.1986) (stating that Wisconsin's dealership law did not apply extraterritorially); *Gilchrist Mach. Co. v. Komatsu Am. Corp.,* 601 F.Supp. 1192 (S.D.Miss.1984) (denying extraterritorial application to California franchise act). However, there have been instances of courts finding that franchise statutes apply extraterritorially, *see Infomax,* 976 F.Supp. at 1254 (finding that contractual choice-of-law provision made the IFDA applicable to non-Illinois franchisee); *Department of Motor Vehicles v. Mercedes–Benz of N. Am., Inc.,* 408 So.2d 627 (Fla.Dist.Ct.App.1981) (finding New Jersey franchise law benefited Florida franchisee). Further, as CB points out, at least one commentator has argued that the cases limiting the application of franchise statutes to the home state have been erroneously decided. Carpinello, TESTING THE LIMITS OF CHOICE OF LAW CLAUSES: FRANCHISE CONTRACTS AS A CASE STUDY, 74 Marq.L.Rev. 57 (1990).

We follow the weight of authority in finding that the IFDA does not apply to non-Illinois franchisees. *See Highway Equipment,* 908 F.2d at 63. When the franchise legislation was originally passed in 1973, the Illinois Supreme Court had stated that it would not give extraterritorial effect to Illinois statutes unless the legislature expressly directed it to do so. *See Graham v. General U.S. Grant Post No. 2665, V.F.W.,* 43 Ill.2d 1, 248 N.E.2d 657, 660 (1969). The IFDA does not indicate any intention by the General Assembly to have the Act apply extraterritorially. *See Highway Equipment,* 908 F.2d at 63. Moreover, when the Illinois legislature reenacted the IFDA in 1988, it confirmed this position by incorporating specific language extending the statute only to businesses located in the State of Illinois. 815 ILCS 705/19. In accordance with this manifestation of legislative intent, we will not apply the IFDA to the franchisees in this case.

The *Infomax* case cited by CB does not, we think, require a different result. In that case the court largely rested its decision on the ground that the legislature's intent is not dispositive with respect to the issue of extraterritoriality. 976 F.Supp. at 1253. Instead, the court found that since applying the IFDA to non-Illinois franchisees did not affect any interests of the State of Illinois and did not actually give extraterritorial effect to the "laws" of Illinois (it only gave effect to the parties' contract), the legislative intent was not the relevant focal point of analysis. *Id.* However, we find this reasoning unpersuasive since it clearly *is* the Illinois law that is being given extraterritorial effect—directly contrary to the legislature's wishes. It seems reasonable to think that Illinois has at least some interest in ensuring that the laws it passes are interpreted in accordance with their intended meaning. Moreover, where a contractual choice-of-law provision refers the parties to a state law, like the IFDA, which by its express terms does not apply to them, we think it is only by a strained analysis of the principles of choice-of-law that the law is nonetheless found to apply.

Even if we were to agree that the IFDA applies to non-Illinois franchisees, we nevertheless would have to find that CB's claim under the IFDA is deficient as a matter of law. Specifically, even if we accepted the facts as alleged by CB, McDonald's certainly had "good cause" to terminate CB's franchise under the terms of the IFDA. The statute makes clear that "good cause" includes the failure of a franchisee to comply with the agreement's provisions and to cure any such default "after being given notice thereof and a reasonable opportunity to cure ... which in no event need be more than 30 days." 815 ILCS 705/19(b). As we have stated before, there is no question that CB failed to comply with the legal terms of the agreements requiring, among other things,

timely payment of rents and fees. McDonald's sent a notice of default to CB on July 25, 1997, and provided CB with 30 days to cure. Under the explicit terms of the IFDA, McDonald's was thereby justified in terminating the franchises.

CB argues that McDonald's failed to provide it with a "reasonable opportunity" to cure since it sent the notice of default knowing that CB would require more than 30 days to cure and since James Flaum misled Burkes into believing McDonald's would not terminate by August 25, 1997. However, the statute states that "reasonable opportunity" to cure need *"in no event"* be more than 30 days. We take the IFDA to mean what it says, *see Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992), and find that McDonald's has complied with the statutory requirements. Because we find that, even accepting the facts as CB alleges, CB cannot succeed on its IFDA claim as a matter of law, we dismiss its counterclaim Count II and find that CB fails to provide a basis for denying McDonald's motion for summary judgment.

Finally, we address CB's affirmative defenses. CB argues that it has asserted affirmative defenses that its termination was without good cause and actually motivated by bad faith and retaliation. These defenses, it asserts, preclude summary judgment. However, we think that CB's "affirmative defenses" are merely reiterations of its counterclaims—specifically, that Burkes was misled to believe that McDonald's would subordinate its interests and would not pursue termination proceedings. We have already addressed these claims above. Although CB has asserted other vague affirmative defenses (CB mo.to file am.ans. at 3–4), nowhere does it address the legal relevancy of these claims as they specifically relate to McDonald's arguments on summary judgment. Assuming that no factual dispute exists because the facts are as CB alleges, CB nevertheless has been unable to show why McDonald's should not prevail on its claims as a matter of law. Therefore, we grant McDonald's motion for summary judgment.

6. Because we grant McDonald's summary judgment motion and motion to dismiss, we also

In conclusion, we deny CB's Rule 56(f) motion and grant McDonald's motion to dismiss and, in part, its motion for summary judgment.[6] This means that McDonald's is entitled to immediate possession of the St. Clair and Carnegie McDonald's and that CB is to comply with the terms of the agreements regarding surrender of possession (cplt. Count I). It also means that McDonald's is entitled to damages for CB's unlawful post-termination use of its trade names, service marks and trademarks under the Lanham Act (cplt. Count II) and for pretermination payments due and unpaid under the franchise agreements (cplt. Count III). What those damages might be was not a focus of the prior briefing, and we therefore continue the motion for summary judgment to the extent it asks for damages.

dismiss CB's motion to compel production of documents from McDonald's as moot.