# Illinois Official Reports

## Appellate Court

*Slepicka v. State*, 2015 IL App (4th) 121103-B

| | |
|---|---|
| Appellate Court Caption | MARY SLEPICKA, By and Through JoANN KAMINSKI, Her Agent and Attorney-in-Fact, Plaintiff-Appellant, v. THE STATE OF ILLINOIS, Acting Through THE DEPARTMENT OF PUBLIC HEALTH, TERESA GARATE, Ph.D., Its Assistant Director, and LaMAR HASBROUCK, MD, MPH, Its Director; and HOLY FAMILY VILLA, Defendants-Appellees. |
| District & No. | Fourth District<br>Docket No. 4-12-1103 |
| Opinion filed<br>Modified upon denial<br>of rehearing | July 7, 2015<br><br>September 14, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 12-MR-743; the Hon. John P. Schmidt, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Duane D. Young, of LaBarre, Young & Behnke, of Springfield, for appellant.<br><br>Mark J. Silberman and Amy E. McCracken, both of Duane Morris LLP, of Chicago, for appellee Holy Family Villa.<br><br>Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and John P. Schmidt, Assistant Attorney General, of counsel), for other appellees. |

| Panel | JUSTICE APPLETON delivered the judgment of the court, with opinion.<br>Justices Holder White and Steigmann concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Holy Family Villa, a not-for-profit Illinois corporation, operates a nursing home by that name in Palos Park. Plaintiff, Mary Slepicka, is a resident of the nursing home. Defendant served upon her a notice of involuntary transfer or discharge on the ground of nonpayment. See 42 C.F.R. § 483.12(a)(2)(v) (2012). She administratively appealed (see 210 ILCS 45/3-410 (West 2012)), and after an evidentiary hearing, the Department of Public Health approved the notice of involuntary transfer or discharge (see 210 ILCS 45/3-707 (West 2012)). Plaintiff then filed a complaint for judicial review with the Sangamon County circuit court, and the court upheld the administrative decision. See 210 ILCS 45/3-713(a) (West 2012). Plaintiff appeals.

¶ 2    After reviewing the administrative record, we are unable to say the decision by the Department of Public Health is against the manifest weight of the evidence. See *Ulysse v. Lumpkin*, 335 Ill. App. 3d 886, 893 (2002). Therefore, we affirm the administrative decision and the judgment of the circuit court.

¶ 3                                        I. BACKGROUND
¶ 4                    A. The Initial Dispute Over Venue and Subject-Matter Jurisdiction
¶ 5    This is the second time this case has come before us. The first time, we decided that (1) Cook County, rather than Sangamon County, was the only permissible venue under section 3-104 of the Administrative Review Law (735 ILCS 5/3-104 (West 2012)) (*Slepicka v. State of Illinois*, 2013 IL App (4th) 121103, ¶ 31, *aff'd in part & vacated in part sub nom. Slepicka v. Illinois Department of Public Health*, 2014 IL 116927); and (2) filing the complaint in an impermissible venue, Sangamon County, had no effect on the subject-matter jurisdiction of the Sangamon County circuit court (*id.* ¶ 26).

¶ 6    The supreme court agreed with that much of our analysis (*Slepicka*, 2014 IL 116927, ¶¶ 27, 43), but the supreme court disagreed with our decision to vacate the judgment of the Sangamon County circuit court and transfer this case to the correct venue, Cook County, for a new decision by the circuit court there (*id.* ¶ 45). As we ourselves had held, filing in the wrong venue had no effect on subject-matter jurisdiction. *Slepicka*, 2013 IL App (4th) 121103, ¶ 26. And in the supreme court's view, it would have been a waste of judicial resources to transfer this case to the Cook County circuit court and start the judicial review all over again. *Slepicka*, 2014 IL 116927, ¶ 48. So, the supreme court vacated the portion of our judgment that vacated the Sangamon County circuit court's judgment, and the supreme court directed us to go ahead and review the agency's decision on its merits. *Id.*

¶ 7    Accordingly, that is what we will do, and we will begin by summarizing the evidence in the administrative hearing, which was held in the nursing home, in Palos Park, on May 24, 2012.

¶ 8                              B. The Administrative Hearing
¶ 9                              1. *The Testimony of Audrey Sparks*
¶ 10                             a. Her Job
¶ 11    Audrey Sparks testified she was the fiscal manager of Holy Family Villa, a skilled nursing facility with 99 beds, 65 of which were Medicaid-certified. She was in charge of the billing.

¶ 12                         b. Plaintiff's Admission to the Nursing Home
                             and Her Change From Medicare to Private Pay

¶ 13    Plaintiff, who was 88 years old at the time, was admitted to the nursing home on March 29, 2011, as a Medicare resident, after a stay of three days in a hospital. Her attorney-in-fact, JoAnn Kaminski, signed a contract on her behalf. The contract designated plaintiff as a recipient of Medicare, Part A.

¶ 14    On April 10, 2011, after the Medicare days ran out, Kaminski signed a new contract on plaintiff's behalf, this one designating plaintiff as a "Private-Pay Resident." Under this new contract, the "Basic Fee" was $231 per day for "intermediate care" or $252 per day for "max[imum]-intermediate care."

¶ 15    The contract contemplated that plaintiff could eventually qualify for Medicaid, but the contract did not guarantee that Medicaid would cover all the services she received at the nursing home. One of the "general provisions" of the contract was as follows:

"6. Qualification for Funding Sources.

(a) HOLY FAMILY does not make any assurance of any kind whatsoever that Resident's care will be covered by Medicaid ***.

***

(c) Since HOLY FAMILY will accept public financial assistance in lieu of sources of private payment, Resident and Other Parties agree to take all steps necessary to apply for and to obtain public financial assistance under any program for which Resident may be eligible."

¶ 16    Although the contract designated plaintiff as a "Private-Pay Resident" by a checkmark written next to that term, the contract included a general provision for "Public Pay Residents" (it was a fill-in-the-blank contract):

"8. Services and Fees for Public Pay Residents. Services for Public Pay Residents shall be provided at the following fees and terms:

(a) Covered services and items provided under the Medicaid programs shall be provided at the prevailing Medicaid rates. ***

(b) In the case of an approved Medicaid recipient, HOLY FAMILY shall not charge, solicit, accept or receive, in addition to any amount otherwise required to be paid under the state and federal Medicaid programs, any gift, money, donation, or other consideration as a precondition of admitting (or expediting the admission of) the individual to HOLY FAMILY or as a requirement for Resident's continued stay in HOLY FAMILY.

(c) However, paragraph 8(b) shall not be construed as preventing HOLY FAMILY from charging Medicaid clients for items and services Resident has requested and received and that are *not* covered or paid for under the Medicaid programs." (Emphasis in original.)

¶ 17    Under the heading of "TERMINATION OR MODIFICATION OF CONTRACT," the contract provided:

"11. Involuntary Discharge. HOLY FAMILY reserves the right to transfer or discharge Resident involuntarily only for one or more of the following reasons:

* * *

(d) For either late payment or non-payment for Resident's stay (except as prohibited by Title XVIII [(Medicare)] or Title XIX [(Medicaid)] of the federal Social Security Act) after reasonable notice ***."

¶ 18                                c. The Arrearage

¶ 19    On February 17, 2012, the Department of Healthcare and Family Services approved plaintiff for Medicaid, and the approval was retroactive to June 1, 2011. Nevertheless, Sparks explained, she could not bill Medicaid for plaintiff's stay in room 222, because that room was not certified for Medicaid.

¶ 20    The state Medicaid agency had warned defendant it would not pay for residency in noncertified rooms. Respondent's exhibit No. 9 was a letter, dated April 22, 2009, from Kelly Cunningham, chief of the Bureau of Long-Term Care, a bureau within the Department of Healthcare and Family Services. The letter was addressed to defendant's administrator, Roberta Magurany, and it began by acknowledging that defendant recently had "reduced the number of [Medicaid-]certified beds from 99 to 65." After listing the room numbers that comprised the "Medicaid distinct part" of defendant's nursing home (room 222 was not among them), the letter said: "The Department will not pay for the care of new admissions to the facility on or after April 1, 2009, unless the resident is residing in one of the Medicaid distinct part beds listed above."

¶ 21    Sparks testified that plaintiff was moved to a Medicaid-certified bed on March 5, 2012, but that before then, per Cunningham's letter, there was no coverage by Medicaid. Consequently, as of March 5, 2012, plaintiff owed $13,776.65. As of the day of the hearing, she owed $15,749.88.

¶ 22                          d. Her Conversations With Joe Oettel

¶ 23    Kaminski retained Joe Oettel to assist plaintiff with her application for Medicaid. According to a memorandum Sparks made on September 30, 2011, Oettel telephoned her that day and "stated he just filed a Medicaid application for [plaintiff]" and that he "was asking for the effective date of [June 1, 2011]." Sparks requested "the breakdown of [plaintiff's] income." Oettel responded that Sparks "did not need to know that." He wanted her to take his word for it that plaintiff's "liability" would be $0 for June 2011, $1,389.40 for July 2011, $1,811.30 for August 2011, $1,811.30 for September 2011, and $1,811.30 for October 2011. He stated "he would have the approval within 45 days" and that "[o]nce the approval [came] in, [defendant] could use the credit on her account to pay the liability due." Sparks expressed

concern that if plaintiff refrained from paying during those months, she would have too much in assets to qualify for Medicaid. Oettel told Sparks "not to worry about that."

¶ 24 Oettel then asked Sparks if plaintiff "was in a Medicaid certified bed." Sparks answered she did not know but that she would find out. After looking into the matter, she called Oettel back and told him that plaintiff "was not in a certified bed." (In his testimony, Oettel denied she called him back.) Oettel asked her when defendant "would be moving her to a certified bed," and she answered she "would inform [the] Administrator and Social Service director since they were the ones responsible for room changes."

¶ 25 2. *The Testimony of Julie Regan*

¶ 26 a. Plaintiff's Application for Admission to the Nursing Home
and Defendant's Assumption, Based on the Application,
That She Would Have To Spend Down Before Receiving Medicaid

¶ 27 Julie Regan was the admissions and social services director of defendant's nursing home. She testified that, in February 2011, Kaminski submitted to her an application for plaintiff's admission to the nursing home. According to the application (respondent's exhibit No. 10), plaintiff owned "Property" having an estimated value of $175,000 (Kaminski had written a question mark after that estimate) and a money market account worth $40,000, and she had approximately $25,000 in a checking account.

¶ 28 Defendant's attorney asked Regan:

"Q. When [plaintiff] was admitted, why wasn't she placed in a Medicaid-certified bed at that point?

A. Because she was coming in under Medicare and was then going to a private pay status. From the application, it showed she had sufficient funds for three to four years and was not going to need a Medicaid bed at that time.

Q. And did you discuss that with JoAnn Kaminski on admission?

A. Her and I had multiple conversations prior to admission on [plaintiff's] resources.

Q. And did JoAnn ever tell you that [plaintiff's] resources changed?

A. We had updated the application. Her and I had talked about a Money Market that she had, I believe, most likely with savings and checkings as well, as well as her house that was on the market, or was going to be on the market, that JoAnn had indicated was to go for her care as that was part of [plaintiff's] assets.

Q. And did JoAnn ever tell you that–let me withdraw that.

Did you ever learn that the house was sold?

A. I did.

Q. And do you [know] when the house was sold?

A. I cannot recall that date.

* * *

Q. Did JoAnn ever indicate to you that the funds from the house would not be available to pay for [plaintiff's] care?

A. No, she did not. It was actually on the contrary. Her and I had multiple discussions that the assets of her home would be used towards her care; therefore, we

did not need to place her into a Medicaid-certified bed and were not planning to do it at that point, because she had ample funds.

* * *

Q. Did you know that JoAnn Kaminski was applying for Medicaid for [plaintiff]?

A. Yes.

Q. And when did you learn of that?

A. In September of 2011, end of September.

Q. Why didn't Holy Family Villa move [plaintiff] into a Medicaid-certified bed at that time?

A. Because we thought she would go through a spend-down from Public Aid, because she had sufficient funds, from my conversations, in the application, indicating the assets.

Q. Why would Holy Family Villa have offered to help JoAnn Kaminski apply for Medicaid earlier that year?

A. Because a lot of times families want the assurance that they're going to be approved for Medicaid. Medicaid applications are approved with spend-downs."

¶ 29 Although Regan disclaimed any expertise in Medicaid law, it was her understanding that a home was exempt from consideration for purposes of Medicaid, but it also was her understanding that once a home was sold, the proceeds counted for purposes of Medicaid and the proceeds had to be spent down. Kaminski had told her the home would be sold.

¶ 30                              b. Plaintiff Obtains Medicaid

¶ 31 In March 2012, defendant learned that the Department of Healthcare and Family Services had approved plaintiff for Medicaid. On March 2, 2012, Regan made a social service progress note that plaintiff was being moved to a Medicaid-certified room.

¶ 32 Between June 1, 2011, and March 2, 2012, Regan never investigated whether a Medicaid-certified bed was available for plaintiff. Nor was she aware that any other staff member had done so. Regan testified she had no reason to perform such an investigation because, until plaintiff was approved for Medicaid, she assumed the proceeds from the sale of the house would be applied toward her care at the nursing home. Kaminski "had indicated that those assets were going to go towards her care."

¶ 33                         3. *The Testimony of Vida Wojewski*

¶ 34 Vida Wojewski was an administrative assistant at the nursing home. She filed Medicaid applications and compiled statistical data.

¶ 35 In the spring of 2011, Kaminski requested Wojewski to assist her in preparing a Medicaid application for plaintiff. Wojewski was aware that, as the owner of a house which was on the market, plaintiff might have to spend down once the house sold, but they "were preempting."

¶ 36 On July 26, 2011, while Wojewski was still in the process of obtaining from Kaminski all the documentation necessary for a Medicaid application, Kaminski "gathered her documents from the [nursing home] and indicated she was going to be working with" someone else in preparing the Medicaid application. Kaminski never explained why she no longer wanted

Wojewski's assistance. She merely "came to retrieve her paperwork and indicated she was going in a different direction" and that she "had sought advice elsewhere."

¶ 37    In March 2012, Wojewski learned that plaintiff was approved for Medicaid and that the approval was retroactive to June 1, 2011.

¶ 38                          4. *The Testimony of Roberta Magurany*

¶ 39    Roberta Magurany was the administrator of defendant's nursing home. She testified that on March 4, 2012, plaintiff was transferred to room 243-B, which was Medicaid-certified. Until then, she was in room 222, which was noncertified. The reason why plaintiff was not transferred earlier was that there was a waiting list of residents wanting Medicaid-certified beds.

¶ 40    Magurany admitted that during the period of June 1, 2011, to March 4, 2012, some of the Medicaid-certified beds were occupied by private-pay residents. She further admitted that, before the administrative hearing, she made no "inquiry *** to determine whether or not a Medicaid bed was available at any time after June 1st, 2011, before *** March 4th, 2012, into which [plaintiff] could have been moved."

¶ 41    On the other hand, when defendant's attorney asked Magurany why plaintiff was "not moved into a certified bed prior to March 4 of 2012," she answered: "Because there were other residents waiting for certified beds prior to her admission to the facility, and we did not have appropriate certified beds to place [her] into."

¶ 42    On a bill for $14,162.50, which Magurany sent to Kaminski on November 1, 2011, Magurany wrote: "[Plaintiff] remains in a noncertified bed[,] waiting for a certified bed. Please bring this bill up to date. Contact Audrey Sparks of your intent."

¶ 43    Defendant's attorney asked Magurany:

"Q. You have heard discussion of a couple of different types of waiting lists. Is there more than one waiting list for the facility?

A. There's a waiting list for, actually, admission into the facility, and there is a waiting list for certified beds, that are people in private pay in certified beds that will be going Public Aid within the next six to eight months, that have been private pay probably for years, and they were the ones remaining in the certified beds. So we had to wait until–[plaintiff] was not the only one waiting for a certified bed.

Q. Do you keep a list of the people waiting for certified beds?

A. Well, we have an ongoing one on a daily basis. Whether or not we can backtrack and go back to it, I'd have to take a look at that. But on a daily basis, we know. Should there be a private pay in a certified bed, Vida [Wojewski] gives us information that they're going to be going in four months, five months. So we know ahead of time that they're going to be going Public Aid.

Q. How is it that you get the information that you know ahead of time when they're going to be going into private pay–I'm sorry. How do you know ahead of time when they're going to need the Public Aid bed?

A. They contact Vida [Wojewski]. We ask for at least six to eight months['] notice, so we can keep track of it.

Q. Is that based on the resident's financial condition?

A. Yes, it is."

¶ 44            5. *The Testimony of JoAnn Kaminski*

¶ 45      According to the testimony of JoAnn Kaminski, plaintiff is a widow, and she has no children. Kaminski is "just a very good friend" of plaintiff and is unrelated to her. She is plaintiff's agent under an Illinois statutory short-form power of attorney for property.

¶ 46      In February 2011, as plaintiff's agent, Kaminski filled out an application for her to be admitted to defendant's nursing home. In the application, Kaminski stated that plaintiff had "a little over $60,000 in cash" and "a house worth approximately $175,000."

¶ 47      With Kaminski's assistance, plaintiff sold the house in August 2011. The net sales proceeds were $143,000. Kaminski put this money into plaintiff's bank account, and plaintiff made an appointment with her attorney, Mike Conway.

¶ 48      Conway referred Kaminski to a "financial expert," Joe Oettel, and on Oettel's recommendation, Kaminski put the $143,000 into an "annuity" or "trust." Oettel informed Kaminski that plaintiff would qualify for Medicaid as long as no more than $30 a month was withdrawn from this "annuity" or "trust" as a personal needs allowance. Otherwise, the annuity would pay out $2,154.69 per month for five years and four months, to be applied toward plaintiff's care at Holy Family Villa. The idea was that, rather than quickly exhaust her estate by paying the higher private-pay rate, the annuity would be distributed over her remaining life expectancy, at the lower Medicaid rate.

¶ 49      Defendant's attorney asked Kaminski:

     "Q. Who is the beneficiary of [plaintiff's] trust?

     A. I guess I am. [Plaintiff] is going to live–I swear to God, [plaintiff] is going to live to a hundred something. The lady doesn't take any medicine or anything. She has her handicap. She's got a little slight dementia. She's going to outdo you and me.

     Q. And did you tell [plaintiff] she would be on an allowance after this application?

     A. Yes.

     Q. And what did she tell you?

     A. Okay.

     Q. And you never told [defendant] that you were doing this trust, did you?

     A. I did not know this was happening until [plaintiff] wanted to see her attorney when her house was being sold. This is when it all developed, when she was at her attorney, and her attorney, Mike Conway, advised this was something good, to put into an annuity.

     Q. And you never told [defendant] this, did you?

     A. I didn't think at the time it was necessary for me to say anything."

¶ 50            6. *The Testimony of Joe Oettel*

¶ 51      Joe Oettel testified that on September 27, 2011, in Conway's office, Kaminski hired him to handle plaintiff's application for Medicaid. Plaintiff had just sold her house for $143,000.

¶ 52      On Oettel's advice, Kaminski put this $143,000 into an annuity that would pay plaintiff an amount of income each month over her remaining life expectancy. He testified this was "an allowable and approved transaction with the Department of Human Services." Citing section

120.387(e)(13) of Title 89 of the Illinois Administrative Code (89 Ill. Adm. Code 120.387(e)(13) (2012)), Oettel opined that plaintiff had "the right, under Medicaid law, to make an allowable transfer for fair market value to convert her assets into an income stream payable to her over her life expectancy of five years and four months." (We note that, under section 120.388(n)(1), "[t]he purchase of an annuity by or on behalf of an institutionalized person *** shall be treated as a transfer of assets for less than [fair market value] unless *** the annuity names the State of Illinois as the remainder beneficiary in the first position for up to the total amount of medical assistance paid on behalf of the institutionalized person." 89 Ill. Adm. Code 120.388(n)(1) (2012). It appears that, ever since 2005, naming the state as a remainder beneficiary of the annuity has been a requirement of federal statutory law. Gene V. Coffey *et al.*, *Analysis of Changes to Federal Medicaid Laws Under the Deficit Reduction Act of 2005*, 2 NAELA J. 189, 208-09 (2006); 42 U.S.C. § 1396p(c)(1)(F) (2012). In her petition for rehearing, however, plaintiff points out that, under section 120.387(e)(13) of Title 89 of the Illinois Administrative Code, which applies to Medicaid applications filed before January 1, 2012 (she filed hers on September 30, 2011), she did not have to name the state as a remainder beneficiary. We intend no criticism of plaintiff for this annuity–she suggests in her petition for rehearing that we might be "prejudiced" against her because of it–and its legal effect for Medicaid purposes is beyond the purview of this appeal. We merely are trying to head off a question readers probably would have of how someone could qualify for Medicaid, a medical assistance program for the poor, while owning an annuity worth $143,000.)

¶ 53   In Oettel's view, this annuity sheltered the $143,000 from consideration for purposes of Medicaid, and because the approval for Medicaid was retroactive to June 1, 2011, he claimed that plaintiff actually had overpaid defendant. He testified: "[T]he total overpayment that my client has made from June 1st[,] 2011[,] through February 29th, 2012[,] is $28,246.41, and I expect that to be refunded to my client as soon as possible."

¶ 54                                        II. ANALYSIS
¶ 55                               A. The Sufficiency of the Notice
¶ 56   In her petition for rehearing, plaintiff reminds us that the administrative law judge relied exclusively on Illinois law. She says: "Please recall that Defendant invoked federal law, but the [administrative law judge] decided the matter under Illinois law, a matter the Opinion also overlooked and failed to address."

¶ 57   Plaintiff seems to assume that by citing federal law in its notice of involuntary discharge or transfer, defendant effectively placed Illinois law under interdiction. We are aware of no authority for that assumption. We are aware of no authority holding that a nursing home forfeits any statutory or regulatory provision that it does not cite in the notice. "Pleadings or charges in an administrative proceeding need not be drawn to comply with the same technical requirements as imposed in court actions, but *** administrative pleadings must allege proper *facts* to demonstrate the basis upon which the claim of the pleader is founded." (Emphasis added.) *Metz v. Illinois State Labor Relations Board*, 231 Ill. App. 3d 1079, 1100 (1992). Plaintiff does not identify any material fact the notice omitted to the detriment of her ability to prepare a defense. See *Vuagniaux v. Department of Professional Regulation*, 208 Ill. 2d 173, 196 (2003).

¶ 58                                B. Alleged Violation of a Federal Regulation

¶ 59        Plaintiff argues that because she became retroactively eligible for Medicaid from June 2011 onward, defendant violated a federal regulation by charging her, from June 1, 2011, to March 4, 2012, amounts in excess of the charges allowable under Medicaid. She quotes from section 483.12(a)(2)(v) of Title 42 of the Code of Federal Regulations: "For a resident who becomes eligible for Medicaid after admission to a facility, the facility may charge a resident only allowable charges under Medicaid ***." 42 C.F.R. § 483.12(a)(2)(v) (2011).

¶ 60        This argument, defendant counters, is fallacious because it assumes that the term "facility," in section 483.12(a)(2)(v), necessarily describes the nursing home as a whole. Actually, defendant explains, "facility" means only the entity that participates in the Medicaid program, regardless of whether the entity is an institution as a whole or a distinct part of an institution. Sections 483.5(a) and (b)(1) provide in part:

> "(a) *Facility defined*. For purposes of this subpart [(subpart B, entitled 'Requirements for Long Term Care Facilities' and consisting of sections 483.1 to 483.75)], *facility* means a skilled nursing facility (SNF) that meets the requirements of sections 1819(a), (b), (c), and (d) of the [Social Security Act (42 U.S.C. § 1395i-3(a), (b), (c), (d))], or a nursing facility (NF) that meets the requirements of sections 1919(a), (b), (c), and (d) of the Act [(42 U.S.C. § 1396r(a), (b), (c), (d))]. 'Facility' may include a distinct part of an institution (as defined in paragraph (b) of this section and specified in § 440.40 and § 440.155 of this chapter [(42 C.F.R. §§ 440.40, 440.155 (2011))]) ***. *For Medicare and Medicaid purposes (including eligibility, coverage, certification, and payment), the 'facility' is always the entity that participates in the program, whether that entity is comprised of all of, or a distinct part of, a larger institution*. ***

> (b) *Distinct part*–(1) *Definition*. A distinct part SNF or NF is physically distinguishable from the larger institution or institutional complex that houses it, meets the requirements of this paragraph and of paragraph (b)(2) of this section, and meets the applicable statutory requirements for SNFs or NFs in sections 1819 or 1919 of the Act, respectively [(42 U.S.C. §§ 1395i-3, 1396r)]. A distinct part SNF or NF may be comprised of one or more buildings or designated parts of buildings (that is, wings, wards, or floors) ***." (Emphases added.) 42 C.F.R. § 483.5(a), (b)(1) (2011).

¶ 61        Given this definition of "facility" and considering that defendant's nursing home has a "distinct part SNF [(skilled nursing facility)]," defendant interprets section 483.12(a)(2)(v) to mean, for purposes of the present case: "For a resident who becomes eligible for Medicaid after admission to a *Medicaid-certified distinct part of a* facility, the *Medicaid-certified distinct part of a* facility may charge a resident only allowable charges under Medicaid." (Emphases in original.)

¶ 62        A distinct part of defendant's nursing home was certified for Medicaid; the rest of the nursing home was noncertified. Defendant's interpretation gives effect to section 483.5(a), which says that, "[f]or *** Medicaid purposes (including eligibility ***), the 'facility' is always the entity that participates in the program, whether that entity is comprised of all of, or a distinct part of, a larger institution." 42 C.F.R. § 483.5(a) (2011). In the introductory prepositional phrase of section 483.12(a)(2)(v), "facility" has to mean only "the entity that participates in the [Medicaid] program." Otherwise, a facility lacking certification to participate in Medicaid would be limited to charging a Medicaid-eligible resident only

- 10 -

allowable charges under Medicaid, even though the facility did not wish to participate in Medicaid and, indeed, for lack of certification, could receive no reimbursement from Medicaid.

¶ 63 An institution may charge private-pay rates for residency in a noncertified part of the institution, even if the resident is poor enough to qualify for Medicaid. Just because a resident is financially eligible for Medicaid, it does not necessarily follow that Medicaid will cover every expense the resident incurs during the period of eligibility, regardless of where the resident incurs the expense. If a resident incurs an expense outside the "distinct part SNF," *i.e.*, in the remaining area of the institution, the area that does not participate in Medicaid and is not certified to do so, it would be impossible for the institution to "accept, as payment in full, the amounts paid by the [Medicaid] agency"–because there would be no amounts paid by the Medicaid agency. 42 C.F.R. § 447.15 (2011).

¶ 64 Thus, contrary to plaintiff's argument, section 482.12(a)(2)(v) (42 C.F.R. § 482.12(a)(2)(v) (2011)) does not limit defendant to charging Medicaid rates for her residency in room 222, which was outside the "distinct part SNF." 42 C.F.R. § 483.5(b)(1) (2011).

¶ 65 C. Plaintiff's Motion To Supplement the Administrative Record

¶ 66 The circuit court granted plaintiff's motion to supplement the record with a "Notice of Decision on Application for Medical Assistance," which the Department of Healthcare and Family Services issued to plaintiff on July 6, 2012. This ruling was over defendant's objection.

¶ 67 Defendant had a valid reason to object. Under the Administrative Review Law (735 ILCS 5/3-101 to 3-113 (West 2012)), which the Nursing Home Care Act adopts (210 ILCS 45/3-320 (West 2012); *Slepicka*, 2014 IL 116927, ¶ 12), no new evidence can come in during judicial review. Section 3-110 of the Administrative Review Law provides in part: "No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court." 735 ILCS 5/3-110 (West 2012).

¶ 68 By allowing plaintiff to supplement the record with the notice dated July 6, 2012, in which the Department of Healthcare and Family Services approved her for Medicaid beginning in June 2011 and determined that she owed the "facility" $0 for June 2011, $0 for July 2011, $1,080.49 for August 2011, and $1,811.30 for September 2011, the circuit court violated section 3-110 of the Administrative Review Law (735 ILCS 5/3-110 (West 2012)). We will disregard the notice of July 6, 2012, because it is outside the administrative record. See *Interstate Material Corp. v. Human Rights Comm'n*, 274 Ill. App. 3d 1014, 1017 n.1 (1995); *Wilde-Hammar, Inc. v. Connor*, 216 Ill. App. 3d 660, 662 (1991); *Jackson v. Department of Labor*, 168 Ill. App. 3d 494, 499-500 (1988).

¶ 69 Earlier notices, however, are in the administrative record, namely, those that the Department of Healthcare and Family Services issued to plaintiff in February and March 2012. Those notices retroactively approved her for Medicaid, beginning in June 2011, and told her how much she owed the "facility" each month. We will consider those notices. But section 3-110 of the Administrative Review Law (735 ILCS 5/3-110 (West 2012)) requires us to disregard the notice of July 6, 2012, as outside the administrative record.

¶ 70    In her petition for rehearing, plaintiff claims we err by disregarding the notice of July 6, 2012, because, according to plaintiff, section 3-406 of the Nursing Home Care Act (Act) (210 ILCS 45/3-406 (West 2012)) required the administrative law judge to "h[o]ld the record open to receive the final Medicaid decision." Plaintiff writes: "[Section 3-406] expressly states that 'the 21-day written notice period shall not begin until a *final decision* in the matter is rendered ***.' " (Emphasis added.) (Under section 3-402 of the Act (210 ILCS 5/3-402 (West 2012)), "Involuntary transfer or discharge of a resident from a facility shall be preceded *** by a minimum written notice of 21 days ***.")

¶ 71    We have a couple of difficulties with that argument. First, section 3-406 is applicable only "[w]hen the basis for an involuntary transfer or discharge is the result of an action by the Department of Healthcare and Family Services (formerly Department of Public Aid) with respect to a recipient of [Medicaid]." 210 ILCS 45/3-406 (West 2012). The basis of the proposed involuntary transfer or discharge of plaintiff was not an action by the Department of Healthcare and Family Services but, rather, plaintiff's failure to pay the full contractual amount for her stay in room 222, a private-pay room. Second, as plaintiff reminds us in her petition for rehearing, we may not "legislate." "Legislating" would include judicially amending a statute to add an exception that has no basis in the text of the statute. See *In re Estate of Schlenker*, 209 Ill. 2d 456, 466 (2004). Section 3-110 of the Administrative Review Law says: "No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court." 735 ILCS 5/3-110 (West 2012). We see no exception in that text. By considering the notice of July 6, 2012, the circuit court "heard" "new or additional evidence"–evidence the administrative agency never heard. Section 3-110 forbade the court to do so.

¶ 72                        D. The Availability of Medicaid-Certified Beds

¶ 73    In their contract of April 10, 2011, the parties agreed that plaintiff was a "Private-Pay Resident" and that she would pay $231 per day for intermediate care and $252 per day for maximum intermediate care. But defendant also agreed to "accept public financial assistance *in lieu of* sources of private payment" and to "assign rooms *** as needed." (Emphasis added.) Medicaid was "public financial assistance," and plaintiff was a "source[ ] of private payment." By agreeing to accept Medicaid "in lieu of sources of private payment," defendant agreed that once plaintiff became a Medicaid recipient, defendant would charge her no more than the Department of Healthcare and Family Services determined she owed. See 42 C.F.R. § 447.15 (2011) ("A State plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual."); 89 Ill. Adm. Code 140.12, amended at 31 Ill. Reg. 8485 (eff. May 30, 2007) (a provider participating in Medicaid must "[a]ccept as payment in full the amounts established by the Department").

¶ 74    As the contract clearly said, however, it made no guarantee that Medicaid would cover plaintiff's residency in the nursing home. Medicaid has standards, and Medicaid will pay only a skilled nursing facility that has enrolled to participate in the program and has been certified as meeting the standards. 42 C.F.R. § 483.5(b)(1), (b)(2) (2011); 89 Ill. Adm. Code 140.11(a)(2), (a)(3), amended at 32 Ill. Reg. 7727 (eff. May 5, 2008). Consequently, *where* plaintiff receives the services is just as important as her financial eligibility for Medicaid. Financial eligibility

will do her no good in a noncertified room. After becoming eligible for Medicaid, plaintiff can reap the full benefit of her contract only by occupying a room in the "distinct part SNF" of defendant's nursing home, the part enrolled and certified to participate in Medicaid. Residing in the "distinct part SNF" is a condition of her actually receiving Medicaid.

¶ 75 We assume the parties had an implied understanding that defendant would do what it reasonably could to fulfill that condition. See *McCleary v. Wells Fargo Securities, L.L.C.*, 2015 IL App (1st) 141287, ¶ 19. Once defendant became aware of plaintiff's eligibility for Medicaid, defendant could not have rightfully kept her in a private-pay room if a room in the "distinct part SNF" were available. Under the contract, defendant had the discretion to "assign rooms *** as needed." The duty of good faith and fair dealing required defendant to exercise that discretion honestly, not with the motive of defeating plaintiff's right to receive the benefits of the contract–including the benefit of defendant's "accept[ing] public financial assistance in lieu of sources of private payment." See *id.*; *cf.* 810 ILCS 5/1-201(20)(b) (West 2012) (defining " '[g]ood faith' " as "honesty in fact in the conduct or transaction concerned").

¶ 76 Plaintiff accuses defendant of taking advantage of her by keeping her in a noncertified room from June 1, 2011, to March 3, 2012, so that defendant could charge her the private rate of $232 per day instead of the Medicaid rate of $137.16 per day. She points out that, according to Magurany's testimony, there were private-pay residents in Medicaid-certified beds during the period of June 1, 2011, to March 3, 2012, when she was eligible for Medicaid. In plaintiff's view, defendant was obliged to transfer one of these private-pay residents out of a Medicaid-certified bed and assign her to that bed–even if it meant having one of these private-pay residents switch places with her. (In the administrative hearing, the parties referred to "Medicaid-certified beds," but, strictly speaking, Medicaid certification attaches to a facility or to a distinct part of a facility, such as a wing. It does not attach to beds. 42 C.F.R. § 483.5(a), (b)(1) (2011). We occasionally resort to the same usage, but we do not mean to imply that Medicaid certification can be wheeled all over the nursing home, along with the bed.)

¶ 77 But plaintiff was a private-pay resident, too. Why did the duty of good faith and fair dealing oblige defendant to oust another private-pay resident from a Medicaid-certified bed and replace that person with plaintiff? Perhaps plaintiff would answer as follows: although she was, contractually and ostensibly, a private-pay resident, she was different from the private-pay residents in the Medicaid-certified beds because while they were still in the process of spending down to the poverty level of Medicaid, she already was at the poverty level during the period of June 1, 2011, to March 3, 2012–as the Department of Healthcare and Family Services retroactively determined on February 17, 2012.

¶ 78 It does not follow, though, that during the entire period of June 1, 2011, to March 3, 2012, defendant *knew* plaintiff was eligible for Medicaid. The duty of good faith and fair dealing requires a "proper motive," not prophetic infallibility. *Dayan v. McDonald's Corp.*, 125 Ill. App. 3d 972, 991 (1984). After all, it is counterintuitive, to say the least, that with $143,000 in cash from the sale of her house, plaintiff could qualify for Medicaid, which is supposed to be medical assistance for the impoverished. Regan testified: "From the application [for admission to the nursing home], it showed [plaintiff] had sufficient funds for three to four years and was not going to need a Medicaid bed at that time." At some point in time–it is unclear when–defendant changed its mind about plaintiff's ineligibility for Medicaid. By November 2, 2011, Magurany was proceeding on the assumption that plaintiff was eligible for Medicaid, judging by Magurany's note to Kaminski that plaintiff was "waiting for a [Medicaid-]certified

- 13 -

bed." It is unclear how Magurany had arrived at that assumption. Perhaps Oettel had convinced her he had legitimately sheltered the $143,000 from consideration. It is unclear how soon before November 2, 2011, defendant was convinced of plaintiff's eligibility for Medicaid–probably no earlier than September 27, 2011, when Kaminski hired Oettel.

¶ 79    So, there is the ambiguity of when defendant first became aware that, notwithstanding her possession of $143,000 in cash from the sale of her house, plaintiff was eligible for Medicaid. That is one problem with plaintiff's argument that, during the period when defendant allegedly overcharged her, June 1, 2011, to March 3, 2012, she should have been in a Medicaid-certified bed.

¶ 80    Another problem is that, even in November 2011, when defendant evidently knew of plaintiff's eligibility for Medicaid, it is unclear that the duty of good faith and fair dealing required defendant to remove a private-pay resident from a Medicaid-certified bed and replace him or her with plaintiff. The trier of fact, the Department of Public Health, did not have to find that defendant had an "improper motive" in keeping the private-pay residents in the Medicaid-certified beds (*Saunders v. Michigan Avenue National Bank*, 278 Ill. App. 3d 307, 316 (1996)) or that defendant exercised its discretion in room assignments "arbitrarily" or "capriciously" (*Dayan*, 125 Ill. App. 3d at 991). Defendant had a practice or policy of moving private-pay residents to Medicaid-certified beds when defendant became aware they would go onto Medicaid in a few months. Evidently, this forecast was a matter of simple mathematics. If the total dollar value of a resident's assets was known, that total could be divided by the daily private-pay rate to determine how many days it would take the resident to spend down to the threshold for Medicaid eligibility. Instead of waiting until the last minute, when that threshold was reached, defendant tried to anticipate the need and make arrangements ahead of time so that residents did not find themselves continuing to incur private-pay bills after they had spent down to the poverty level for Medicaid. If defendant had required a private-pay resident in a Medicaid-certified bed to switch places with plaintiff, the private-pay resident, in only a few months, would have been in the same predicament as plaintiff: he or she would have been accumulating private-pay bills while being eligible for Medicaid. And at the time, the ousted resident's eligibility could have seemed more clear-cut to defendant than plaintiff's eligibility.

¶ 81    Granted, in the administrative hearing, Magurany answered no when plaintiff's attorney asked her if she herself had made any inquiry to determine whether a Medicaid-certified bed was available from June 1, 2011, to March 3, 2012. Subsequently, though, she testified that there was a waiting list and that until March 4, 2012, no such bed was available. "It is the function of the administrative agency to *** resolve conflicts in the evidence ***." *Suburban Downs, Inc. v. Illinois Racing Board*, 316 Ill. App. 3d 404, 415 (2000).

¶ 82    Magurany testified that defendant needed "at least six to eight months['] notice" of upcoming Medicaid eligibility. Thus, it appears that, in the normal course, a private-pay resident could spend six to eight months on the in-house waiting list for Medicaid beds. Without any shenanigans or bad motive on defendant's part, a resident in the noncertified area of the nursing home could incur private-pay bills, and could become subject to involuntary discharge for nonpayment, while waiting for a Medicaid bed to become available in the "distinct part SNF." See 210 ILCS 45/3-401.1(a-5) (West 2012).

¶ 83    In her brief, plaintiff disputes that, from June 2011 to March 2012, she had to be in a Medicaid bed, or in the "distinct part SNF," as a condition of Medicaid's covering that period.

(Let us pass over the paradox of why, then, plaintiff would be aggrieved that defendant failed to put her in a Medicaid-certified bed sooner.) She writes:

> "The decision of the Administrative Law Judge also states, 'Medicaid will not pay for [plaintiff's] non-certified bed from April 10, 2011[,] to March 3, 2012.' [Citation to record.] There is no support in the record for that conclusion. The facility's witnesses testified no billing was made to Medicaid 'because she was not in a certified bed.' [Citation to record.] It is true Medicaid will not pay for April 10 thru [*sic*] May 30, 2011[,] because those dates were before her Medicaid award was effective and are not disputed. However, [the Department of Human Services] approved her Medicaid application effective June 1, 2011[,] and the [Department of Human Services] notices show exactly how much [plaintiff] owes the nursing home each month from June 1, 2011[,] forward."

¶ 84    We disagree that the administrative record is devoid of support for the conclusion that the Department of Healthcare and Family Services would decline to pay for plaintiff's occupation of a noncertified bed from June 1, 2011, to March 3, 2012. In a letter dated April 22, 2009, Kelly Cunningham, chief of the Bureau of Long-Term Care, warned Magurany: "The Department will not pay for the care of new admissions to the facility on or after April, 2009, unless the resident is residing in one of the Medicaid distinct part beds listed above." That letter is *some* evidence that the Department of Healthcare and Family Services ultimately would decline to pay for plaintiff's occupation of a noncertified bed from June 1, 2011, to March 3, 2012, despite the notices approving her Medicaid application and showing the amounts she owed defendant from June 1, 2011, onward. Again, it is the function of the administrative agency, *i.e.*, the Department of Public Health, to resolve conflicts in the evidence (*Suburban Downs*, 316 Ill. App. 3d at 415), and the administrative agency could believe the letter of April 22, 2009, over the notices.

¶ 85    If, despite the notices to plaintiff, defendant still would have to send a bill to the Department of Healthcare and Family Services, the notices must not be the last word. Bills can be paid or not paid. Probably, the bill would have to specify where, exactly, in defendant's nursing home, plaintiff received the services in question, *i.e.*, her room number. As can be seen from Cunningham's letter, the Bureau of Long-Term Care has on file the room numbers that comprise the certified part of defendant's nursing home and the room numbers that comprise the noncertified part. Presumably, the bureau keeps such information on file for a reason, *i.e.*, to refer to it when receiving bills from nursing homes. It would be a reasonable inference that Cunningham meant what she said in her letter to Magurany and that if defendant actually sent the Department of Healthcare and Family Services a bill for room 222 for the period of June 1, 2011, to March 3, 2012, the bill would come back denied, regardless of the notices previously issued to plaintiff. In other words, the notices might presuppose that plaintiff had a bed in the Medicaid distinct part. Maybe, before going back on the notices, the bureau would have to offer plaintiff an opportunity for a hearing, but we do not see how, through the issuance of these notices, the Department of Healthcare and Family Services could bind itself to do what it lacks legal authority to do. Paying for room 222 with Medicaid would be unlawful because room 222 is noncertified: that is, it is outside the "distinct part SNF" and it has not been certified as meeting the standards for Medicaid. See 42 C.F.R. § 483.1(a)(1), (b) (2011).

¶ 86    In her petition for rehearing, plaintiff concedes that "[the] resident must be in a certified Medicaid bed in order for Medicaid to pay the nursing home." Even so, plaintiff clarifies, her

point is this: "when given acknowledged proper notice by a licensed and certified estate planning professional (Joe Oettel) [that plaintiff] was applying for and would be approved for Medicaid, [defendant] by its *choice* refused to timely move [plaintiff] into a certified bed," even though defendant had a policy of proactively moving private-pay patients into Medicaid-certified beds even before they actually were eligible for Medicaid but when their eligibility was imminent. Plaintiff states that because defendant almost immediately moved her into a Medicaid-certified bed upon learning that her application for Medicaid had been approved, "[t]here *most certainly* was also a certified Medicaid bed available for [plaintiff] to have moved into when properly notified by Mr. Oettel on September 27, 2011[,] by phone conversation with Audrey Sparks, fiscal manager of Holy Family Villa." (Emphasis added.)

¶ 87    We are aware of no evidence that a Medicaid certified room was available on September 27, 2011. Just because such a room was available on March 2, 2012, it does not necessarily follow that one was available on September 27, 2011.

¶ 88    Even if, on September 27, 2011, defendant had a bed available in a Medicaid certified room (and, we repeat, the record appears to contain no evidence to that effect, and plaintiff cites no such evidence), we are unconvinced that a reasonable trier of fact had to find it was out of dishonesty, greed, or some other bad motive that defendant refrained from moving her into the bed at that time. Granted, Sparks testified that Oettel telephoned her on September 30, 2011, and expressed to her his opinion that plaintiff was retroactively eligible for Medicaid from June 2011 onward. Plaintiff trumpets Oetell's qualifications, but she does not cite any evidence that Sparks or anyone else at Holy Family Villa was familiar with his qualifications. See Ill. S. Ct. R. 367(b) (eff. Jan. 1, 2015) ("The petition shall state briefly the points claimed to have been overlooked or misapprehended by the court, with proper reference to the particular portion of the record and brief relied upon ***."). It appears, from Sparks's testimony, that she wanted to know how plaintiff could qualify for Medicaid with her assets, and in so many words, Oettel told Sparks it was none of her business. Actually, it *was* her business because there was a waiting list for Medicaid-certified beds. Plaintiff was not the only resident defendant had to think of. It would be understandable if defendant wanted a little more to go on than Oettel's unexplained conclusions.

¶ 89    The record appears to contain no evidence that Sparks or any of the members of the administration at Holy Family Villa had ever in their lives heard of a Medicaid qualified annuity. The normal course was to spend down assets to become eligible for Medicaid, and in their interactions with each other, that is the course which Kaminski and defendant had contemplated. Earlier in this opinion, we remarked that "it is counterintuitive, to say the least, that with $143,000 in cash from the sale of her house, plaintiff could qualify for Medicaid, which is supposed to be medical assistance for the impoverished." In her petition for rehearing, plaintiff pounces on this remark, accusing us of "legislating" rather than "adjudicating." But that is not a fair characterization of our remark. We were not pronouncing on public policy. Instead, all we were saying was this. Immediate eligibility for Medicaid despite the possession of $143,000 in sales proceeds is not what one might naturally expect, and thus it was not necessarily bad faith on defendant's part to delay transferring plaintiff to a Medicaid-certified room (assuming the availability of such a room).

¶ 90    On top of their apparent unawareness of the very concept of a Medicaid qualified annuity, administrators at the nursing home apparently were unaware that plaintiff had even changed her plan from spending down the sale proceeds to putting them into such an annuity. Kaminski

- 16 -

and Oettel were rather tight-lipped on this score. According to Wojewski's testimony, Kaminski came in one day, gathered up the Medicaid application materials that she and Wojewski had been working on together, and told Wojewski, cryptically, that "she was going in a different direction" and that she "had sought advice elsewhere." Oettel told Sparks she "did not need to know" the how or why of plaintiff's Medicaid eligibility. One might infer that by November 1, 2011, Magurany received enlightenment from *some* source, considering her note to Kaminski of that date that plaintiff was "waiting for a certified bed"–but even that is unclear; we are reading between the lines.

¶ 91    Given all these ambiguities, we do not find it to be "clearly evident" from the administrative record that, for the period of June 1, 2011, to March 3, 2012, when plaintiff occupied room 222, defendant should be precluded from charging her private-pay rates. *Ulysse*, 335 Ill. App. 3d at 893. Nor do we find it to be "clearly evident" that defendant breached the duty of good faith and fair dealing by refraining from assigning plaintiff to a Medicaid-certified bed sooner than March 5, 2012. *Id.*

¶ 92                                III. CONCLUSION

¶ 93    For the foregoing reasons, we affirm the judgment of the Sangamon County circuit court affirming the decision of the Department of Public Health.

¶ 94    Affirmed.